# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

JOHN DOES 1-205, JANE DOES 1-207 and
MINOR DOES 1-4,

        *Plaintiffs,*

  v.

CYRUS FREIDHEIM and CHARLES
KEISER,

        *Defendants*

Civil Action No. _____.

Jury Trial Demanded

## CLASS ACTION COMPLAINT FOR DAMAGES

## I. SUMMARY OF THE COMPLAINT

1.      This case arises as a result of the actions of Chiquita Brands International, Inc., and its subsidiaries and affiliates (collectively, "Chiquita"), in funding, arming, and otherwise supporting terrorist organizations in Colombia in their campaign of terror against the civilian population of the Urabá region, in order to maintain its profitable control of Colombia's banana growing regions. Plaintiffs are family members of trade unionists, banana workers, political organizers, social activists, and others targeted and killed by terrorists, most notably the paramilitary organization United Self-Defense Groups of Colombia (*Autodefensorias Unidas de Colombia*, or AUC), between 1995 and 2004. In order to produce bananas in an environment free from labor opposition and social disturbances, Chiquita, the Defendants Cyrus Freidheim and Charles Keiser, and other non-party individuals funded, armed, and otherwise supported the AUC.  The deaths of Plaintiffs' relatives were a direct, foreseeable, and intended result of Chiquita's illegal and tortious support of terrorist organizations. Chiquita, Mr. Freidheim and Mr. Keiser, and non-parties' actions violated not only Colombian law and U.S. law, but also

1

customary international law prohibiting crimes against humanity, extrajudicial killing, torture, war crimes, and other abuses.

## II.    JURISDICTION

2.        The Court has jurisdiction over this case under 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. § 1350 (Alien Tort Claims Act); and 28 U.S.C. § 1332 (diversity jurisdiction). The amount in controversy for each Plaintiff exceeds $75,000, and the action is between citizens of a State and citizens or subjects of a foreign state.

**3.**        In addition, Plaintiffs invoke the supplemental jurisdiction of this Court with respect to claims based upon laws of the State of New Jersey, the State of Florida, or any other applicable jurisdiction pursuant to 28 U.S.C. § 1367.

## III.    PARTIES

4.        The term "Plaintiffs" herein includes the named plaintiffs and the decedents on behalf of whom they bring this action.

5.        Plaintiff John Doe 1 is a resident and citizen of Colombia. He brings this action individually and as representative of his deceased father, John Doe 2.

6.        Plaintiff Jane Doe 1 is a resident and citizen of Colombia. She brings this action individually and as representative of her deceased mother, Jane Doe 2.

7.        Plaintiff John Doe 3 is a resident and citizen of Colombia. He brings this action individually and as representative of his deceased brother, John Doe 4.

8.        Plaintiff Jane Doe 3 is a resident and citizen of Colombia. She brings this action individually and as representative of her deceased husband, John Doe 5.

9.     Minor Does 1–4 are residents and citizens of Colombia. They are all minor children, who prosecute this action by and through their guardian John Doe 6. They bring this action individually and as representatives of their deceased mother, Jane Doe 4.

10.    Plaintiff John Doe 7 is a resident and citizen of Colombia. He brings this action individually and as representative of his deceased son, John Doe 8.

11.    Plaintiff Jane Doe 5 is a resident and citizen of Colombia.  She brings this action individually and as representative of her deceased husband, John Doe 9.

12.    Plaintiff Jane Doe 6 is a resident and citizen of Colombia.  She brings this action individually and as representative of her deceased husband, John Doe 10.

13.    Plaintiff Jane Doe 7 is a resident and citizen of Colombia.  She brings this action individually and as representative of her deceased husband, John Doe 11.

14.    Plaintiff Jane Doe 8 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased father, John Doe 12.

15.    Plaintiff Jane Doe 9 is a resident and citizen of Colombia. She brings this action individually and as an heir at law on behalf of John Doe 13.

16.    Plaintiff Jane Doe 10 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased son, John Doe 14, and her deceased son, John Doe 15.

17.    Plaintiff Jane Doe 11 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased sister, Jane Doe 12.

18.    Plaintiff Jane Doe 13 is a resident and citizen of Colombia. She brings this action individually and as an heir at law on behalf of John Doe 16.

19.    Plaintiff Jane Doe 14 is a resident and citizen of Colombia. She brings this action individually and as an heir at law on behalf of John Doe 17.

20.   Plaintiff Jane Doe 15 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased husband, John Doe 18.

21.   Plaintiff Jane Doe 16 is a resident and citizen of Colombia. She brings this action individually and as an heir at law on behalf of John Doe 19.

22.   Jane Doe 17 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased son, John Doe 20.

23.   Plaintiff Jane Doe 18 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased husband, John Doe 21.

24.   Plaintiff Jane Doe 19 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased son, John Doe 22.

25.   Plaintiff Jane Doe 119 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased father, John Doe 24.

26.   Plaintiff Jane Doe 20 is a resident and citizen of Colombia. She brings this action individually and as an heir at law on behalf of John Doe 25.

27.   Plaintiff Jane Doe 21 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased mother, Jane Doe 22, and her deceased stepfather, John Doe 26.

28.   Plaintiff Jane Doe 23 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased son, John Doe 27, and her deceased husband, John Doe 28.

29.   Plaintiff Jane Doe 24 is a resident and citizen of Colombia. She brings this action individually and as an heir at law on behalf of Jane Doe 29.

30.   Plaintiff Jane Doe 25 is a resident and citizen of Colombia. She brings this action

individually and as an heir at law on behalf of John Doe 30.

31.    Plaintiff Jane Doe 26 is a resident and citizen of Colombia. She brings this action on behalf of herself and her deceased husband, John Doe 31

32.    Plaintiff Jane Doe 27 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased father, John Doe 105.

33.    Plaintiff Jane Doe 30 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased mother, Jane Doe 31.

34.    Plaintiff Jane Doe 99 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased mother, Jane Doe 100.

35.    Plaintiff Jane Doe 121 is a resident and citizen of Colombia. She brings this action on behalf of herself.

36.    Plaintiff Jane Doe 122 is a resident and citizen of Colombia. She brings this action on behalf of herself.

37.    Plaintiff John Doe 23 is a resident and citizen of Colombia. He brings this action on behalf of himself.

38.    Plaintiff John Doe 32 is a resident and citizen of Colombia. He brings this action on behalf of himself.

39.    Plaintiff John Doe 33 is a resident and citizen of Colombia. He brings this action on behalf of himself.

40.    Plaintiff Jane Doe 28 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased brother, John Doe 34.

41.    Plaintiff John Doe 35 is a resident and citizen of Colombia. He brings this action on behalf of himself.

42.     Plaintiff Jane Doe 29 is a resident and citizen of Colombia. She brings this action on behalf of herself.

43.     Plaintiff John Doe 36 is a resident and citizen of Colombia. He brings this action on behalf of himself.

44.     Plaintiff John Doe 37 is a resident and citizen of Colombia. He brings this action on behalf of himself.

45.     Plaintiff  John Doe 39 is a resident and citizen of Colombia. He brings this action on behalf of himself.

46.     Plaintiff John Doe 40 is a resident and citizen of Colombia. He brings this action on behalf of himself.

47.     Plaintiff  John Doe 41 is a resident and citizen of Colombia. He brings this action on behalf of himself.

48.     Plaintiff  John Doe 42 is a resident and citizen of Colombia. He brings this action on behalf of himself.

49.

50.     Plaintiff Jane Doe 32 is a resident and citizen of Colombia. She brings this action on behalf of herself.

51.     Plaintiff Jane Doe 120 is a resident and citizen of Colombia. He brings this action individually and on behalf of his deceased son, John Doe 44.

52.     Plaintiff John Doe 45 is a resident and citizen of Colombia. He brings this action on behalf of himself.

53.     Plaintiff John Doe 46 is a resident and citizen of Colombia. He brings this action on behalf of himself.

54.     Plaintiffs Jane Doe 33, Jane Doe 34, John Doe 48, John Doe 49, and John Doe 50 are residents and citizens of Colombia. They bring this action individually and on behalf of their deceased family member, John Doe 47.

55.     Plaintiff Jane Doe 35 is a resident and citizen of Colombia. She brings this action individually and as an heir at law on behalf of John Doe 51.

56.     Plaintiff Jane Doe 36 is a resident and citizen of Colombia. She brings this action individually and as an heir at law on behalf of John Doe 52.

57.     Plaintiffs Jane Doe 37, Jane Doe 38, Jane Doe 39, and John Doe 54 are residents and citizens of Colombia. They bring this action individually and on behalf of their deceased family member, John Doe 53.

58.     Plaintiffs Jane Doe 40, John Doe 56, Jane Doe 41, John Doe 57, John Doe 58, Jane Doe 42, Jane Doe 43, and Jane Doe 44 are residents and citizens of Colombia. They bring this action individually and on behalf of their deceased family member, John Doe 55.

59.     Plaintiffs Jane Doe 45 and John Doe 60 are residents and citizens of Colombia. They bring this action individually and on behalf of their deceased family member, John Doe 59.

60.     Plaintiffs Jane Doe 46, John Doe 62, Jane Doe 47, and John Doe 63 are residents and citizens of Colombia. They bring this action individually and on behalf of their deceased family member, John Doe 61.

61.     Plaintiffs Jane Doe 48 and John Doe 65 are residents and citizens of Colombia. They bring this action individually and on behalf of their deceased father, John Doe 64.

62.     Plaintiffs John Doe 66, Jane Doe 49, Jane Doe 50, Jane Doe 51, Jane Doe 52, Jane Doe 53, and Jane Doe 54 are residents and citizens of Colombia. They bring this action individually and on behalf of their deceased family member, John Doe 67.

63.    Plaintiff Jane Doe 55 is a resident and citizen of Colombia. She brings this action individually and as an heir at law on behalf of John Doe 68.

64.    Plaintiffs Jane Doe 56, Jane Doe 57, Jane Doe 58, and John Doe 70 are residents and citizens of Colombia. They bring this action individually and on behalf of their deceased family member, John Doe 69.

65.    Plaintiffs Jane Doe 59, John Doe 71, and Jane Doe 60 are residents and citizens of Colombia. They bring this action individually and on behalf of their deceased family member, John Doe 72.

66.    Plaintiffs Jane Doe 61, John Doe 73, John Doe 74, and John Doe 75 are residents and citizens of Colombia. They bring this action individually and on behalf of their deceased family member, John Doe 76.

67.    Plaintiffs Jane Doe 62, Jane Doe 63, Jane Doe 64, John Doe 77, and John Doe 74 are residents and citizens of Colombia. They bring this action individually and on behalf of their deceased family member, John Doe 78.

68.    Plaintiffs Jane Doe 65, Jane Doe 66, and Jane Doe 67 are residents and citizens of Colombia. They bring this action individually and on behalf of their deceased family member, John Doe 79.

69.    Plaintiffs Jane Doe 68 and Jane Doe 69 are residents and citizens of Colombia. They bring this action individually and on behalf of their deceased mother, Jane Doe 70.

70.    Plaintiffs Jane Doe 71, John Doe 80, Jane Doe 72, Jane Doe 73, and Jane Doe 74 are residents and citizens of Colombia. They bring this action individually and on behalf of their deceased family member, John Doe 81.

71.    Plaintiffs Jane Doe 75, Jane Doe 76, Jane Doe 77, and Jane Doe 78 are residents and

citizens of Colombia. They bring this action individually and on behalf of their deceased family member, John Doe 82.

72.    Plaintiffs Jane Doe 79, Jane Doe 80, Jane Doe 81, Jane Doe 82, Jane Doe 83, Jane Doe 84, and Jane Doe 85 are residents and citizens of Colombia. They bring this action individually and on behalf of their deceased family member, John Doe 83.

73.    Plaintiffs Jane Doe 86, John Doe 84, Jane Doe 87, and Jane Doe 88 are residents and citizens of Colombia. They bring this action individually and on behalf of their deceased family member, John Doe 85.

74.    Plaintiffs Jane Doe 89 and John Doe 86 are residents and citizens of Colombia. They brings this action individually and on behalf of their deceased family member, John Doe 87.

75.    Plaintiffs Jane Doe 90, John Doe 88, Jane Doe 91, John Doe 89, John Doe 90, and Jane Doe 92 are residents and citizens of Colombia. They bring this action individually and on behalf of their deceased family member, John Doe 91.

76.    Plaintiff Jane Doe 93 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased father, John Doe 92.

77.    Plaintiffs Jane Doe 94, Jane Doe 95, and John Doe 93 are residents and citizens of Colombia. They bring this action individually and on behalf of their deceased mother, Jane Doe 96.

78.    Plaintiffs John Doe 94 and Jane Doe 97 are residents and citizens of Colombia. They brings this action individually and on behalf of their deceased father, John Doe 95.

79.    Plaintiffs Jane Doe 98, John Doe 96, and John Doe 97 are residents and citizens of Colombia. They brings this action individually and on behalf of their deceased family member, John Doe 98.

80.    Plaintiffs Jane Doe 103, Jane Doe 104, and John Doe 102 are residents and citizens of Colombia. They bring this action individually and on behalf of their deceased family member, John Doe 103.

81.    Plaintiffs Jane Doe 105 and Jane Doe 106 are residents and citizens of Colombia. They bring this action individually and on behalf of their deceased family member, John Doe 104.

82.    Plaintiffs John Doe 105, John Doe 106, Jane Doe 107, and Jane Doe 108 are residents and citizens of Colombia. They bring this action individually and on behalf of their deceased family member, John Doe 107.

83.    Plaintiffs Jane Doe 109, Jane Doe 110, Jane Doe 111, John Doe 108, and Jane Doe 112 are residents and citizens of Colombia. They bring this action individually and on behalf of their deceased family member, John Doe 109.

84.    Plaintiffs Jane Doe 113, John Doe 110, Jane Doe 114, Jane Doe 115, John Doe 111, Jane Doe 116, John Doe 112, Jane Doe 117, and Jane Doe 118 are residents and citizens of Colombia. They bring this action individually and on behalf of their deceased family member, John Doe 113.

85.    Plaintiff John Doe 114 is a resident and citizen of Colombia. He brings this action individually and on behalf of his deceased brother, John Doe 115.

86.    Plaintiffs Jane Doe 119, Jane Doe 120, Jane Doe 141, Jane Doe 142, John Doe 116, John Doe 117, Jane Doe 123, John Doe 118, Jane Doe 124 and John Doe 119 are residents and citizens of Colombia. They bring this action individually and on behalf of their deceased family member, John Doe 120.

87.    Plaintiff Jane Doe 125 is a resident and citizen of Colombia. She brings this action individually and as a heir at law on behalf of John Doe 121.

88.     Plaintiffs Jane Doe 126, Jane Doe 127, Jane Doe 128, Jane Doe 129, Jane Doe 130, Jane Doe 131, Jane Doe 132, John Doe 122, Jane Doe 133, Jane Doe 134, Jane Doe 135, John Doe 123 and John Doe 124 are residents and citizens of Colombia. They bring this action individually and on behalf of their deceased family member, John Doe 125.

89.     Plaintiffs Jane Doe 136, Jane Doe 137, Jane Doe 138, John Doe 126, John Doe 127, John Doe 128, John Doe 129 and John Doe 130 are residents and citizens of Colombia. They bring this action individually and on behalf of their deceased family member, John Doe 131.

90.     Plaintiffs Jane Doe 139, Jane Doe 140 and John Doe 132 are residents and citizens of Colombia. They bring this action individually and on behalf of their deceased family member, John Doe 133.

91.     Plaintiffs Jane Doe 143, Jane Doe 144, John Doe 134, John Doe 135 and John Doe 135 are residents and citizens of Colombia. They bring this action on behalf of their family member John Doe 137.

92.     Plaintiffs Jane Doe 101, Jane Doe 101, John Doe 99, John Doe 100 and John Doe 101 are residents and citizens of Colombia. They bring this action individually and on behalf of their family member, John Doe 38.

93.     Plaintiffs Jane Doe 145, Jane Doe 146, and John Doe 139 are residents and citizens of Colombia. They bring this action individually and on behalf of their family member, John Doe 138.

94.     Plaintiff Jane Doe 147 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased son, John Doe 140.

95.     Plaintiff Jane Doe 148 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased husband, John Doe 141.

11

96.     Plaintiff Jane Doe 149 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased husband, John Doe 142.

97.     Plaintiff Jane Doe 150 is a resident and citizen of Colombia. She brings this action individually and as a heir at law of John Doe 143.

98.     Plaintiff Jane Doe 151 is a resident of and citizen of Colombia. She brings this action individually and on behalf of her deceased husband John Doe 199.

99.     Plaintiff Jane Doe 152 is a resident and citizen of Colombia. She brings this action individually and as an heir at law for John Doe 144.

100.    Plaintiff Jane Doe 153 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased daughter Jane Doe 154.

101.    Plaintiff Jane Doe 155 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased son John Doe 145.

102.    Plaintiff Jane Doe 156 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased son John Doe 146.

103.    Plaintiff Jane Doe 157 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased son John Doe 147.

104.    Plaintiff Jane Doe 158 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased son John Doe 148.

105.    Plaintiff Jane Doe 159 is a resident and citizen of Colombia. She brings this action individually and as an heir at law for John Doe 149.

106.    Plaintiff Jane Doe 160 is a resident and citizen of Colombia. She brings this action individually and as an heir at law for John Doe 150.

107.    Plaintiff Jane Doe 161 is a resident and citizen of Colombia. She brings this action

individually and on behalf of her deceased brother John Doe 151.

108.   Plaintiff Jane Doe 162 is a resident and citizen of Colombia. She brings this action individually and as an heir at law for John Doe 152.

109.   Plaintiff Jane Doe 163 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased brother John Doe 153.

110.   Plaintiff Jane Doe 164 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased sons John Does 154 and 164 and 180.

111.   Plaintiff Jane Doe 165 is a resident and citizen of Colombia. She brings this action individually and as an heir at law for John Doe 155.

112.   Plaintiff Jane Doe 166 is a resident and citizen of Colombia. She brings this action individually and as an heir at law for John Doe 156.

113.   Plaintiff Jane Doe 167 is a resident and citizen of Colombia. She brings this action individually and as an heir at law for John Doe 157.

114.   Plaintiff Jane Doe 168 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased brother John Doe 158.

115.   Plaintiff Jane Doe 169 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased brother, John Doe 201.

116.   Plaintiff Jane Doe 170 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased sister Jane Doe 169.

117.   Plaintiff Jane Doe 171 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased brother John Doe 159.

118.   Plaintiff Jane Doe 172 is a resident and citizen of Colombia. She brings this action individually and as an heir at law for John Doe 160.

119.    Plaintiff John Doe 162 is a resident and citizen of Colombia. He brings this action individually and on behalf of his deceased son John Doe 161.

120.    Plaintiff Jane Doe 173 is a resident and citizen of Colombia. She brings this action individually and as an heir at law for John Doe 163.

121.    Plaintiff Jane Doe 174 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased father, John Doe 164, and her deceased son, John Doe 210, and, her deceased brothers, John Does 182 and 196.

122.    Plaintiff Jane Doe 175 is a resident and citizen of Colombia. She brings this action individually and as an heir at law for John Doe 165.

123.    Plaintiff Jane Doe 176 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased husband John Doe 166.

124.    Plaintiff Jane Doe 177 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased son, John Doe 167.

125.    Plaintiff Jane Doe 178 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased father, John Doe 203.

126.    Plaintiff Jane Doe 179 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased sons, John Does 197, 198 and 200.

127.    Plaintiff Jane Doe 180 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased brother John Doe 168.

128.    Plaintiff Jane Doe 181 is a resident and citizen of Colombia. She brings this action individually and as an heir at law for John Doe 169.

129.    Plaintiff Jane Doe 182 is a resident and citizen of Colombia. She brings this action individually and as an heir at law for John Doe 170.

14

130.    Plaintiff Jane Doe 183 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased brother, John Doe 171.

131.    Plaintiff Jane Doe 184 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased son, John Doe 172.

132.    Plaintiff Jane Doe 185 is a resident and citizen of Colombia. She brings this action individually and as an heir at law for John Doe 173.

133.    Plaintiff Jane Doe 186 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased husband, John Doe 174.

134.    Plaintiff Jane Doe 187 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased brother, John Doe 175, and her deceased father, John Doe 176.

135.    Plaintiff Jane Doe 188 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased son, John Doe 177.

136.    Plaintiff Jane Doe 189 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased son, John Doe 178.

137.    Plaintiff Jane Doe 190 is a resident and citizen of Colombia. She brings this action individually and as an heir at law for John Doe 179.

138.    Plaintiff Jane Doe 191 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased brother, John Doe 202.

139.    Plaintiff Jane Doe 192 is a resident and citizen of Colombia. She brings this action individually and as an heir at law for John Doe 181.

140.    Plaintiff Jane Doe 194 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased daughter, Jane Doe 195.

141.    Plaintiff Jane Doe 196 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased husband, John Doe 183.

142.    Plaintiff Jane Doe 197 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased on, John Doe 184.

143.    Plaintiff Jane Doe 198 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased brother, John Doe 185.

144.    Plaintiff Jane Doe 199 is a resident and citizen of Colombia. She brings this action individually and as an heir at law for John Doe 186.

145.    Plaintiff Jane Doe 200 is a resident and citizen of Colombia. She brings this action individually and as an heir at law for John Doe 187.

146.    Plaintiff Jane Doe 201 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased father, John Doe 188.

147.    Plaintiff Jane Doe 202 is a resident and citizen of Colombia. She brings this action individually and on behalf of her deceased son, John Doe 204, and as an heir at law for John Doe 189.

148.    Plaintiff Jane Doe 203 is a resident and citizen of Colombia. She is filing this action individually and on behalf of her deceased brother, John Doe 190.

149.    Plaintiff Jane Doe 204 is a resident and citizen of Colombia. She is filing this action individually and on behalf of her deceased mother, Jane Doe 205.

150.    Plaintiff Jane Doe 206 is a resident and citizen of Colombia. She is filing this action individually and as an heir at law for John Doe 191.

151.    Plaintiff Jane Doe 207 is a resident and citizen of Colombia. She is filing this action individually and on behalf of her deceased parents, John Doe 192 and Jane Doe 208, and her

deceased brothers, John Does 207 and 208.

152.     Plaintiff Jane Doe 209 is a resident and citizen of Colombia. She is filing this action individually and as an heir at law for John Doe 193.

153.     Plaintiff Jane Doe 210 is a resident and citizen of Colombia. She is filing this action individually and as an heir at law for John Doe 194.

154.     Plaintiff Jane Doe 211 is a resident and citizen of Colombia. She is filing this action individually and as an heir at law for John Doe 195.

155.     Plaintiff Jane Doe 193 is a resident and citizen of Colombia. She is filing this action individually and on behalf of her deceased daughter, Jane Doe 212, and her deceased son-in-law, John Doe 209.

156.     Plaintiff John Doe 205 is a resident and citizen of Colombia. She is filing this action individually and on behalf of his deceased son, John Doe 206.

157.     On information and belief, all Plaintiffs bringing this action on behalf of deceased family members are the heirs at law of those decedents under Colombian law, with the right to prosecute claims for their deaths.

158.     The Defendant Cyrus Freidheim Jr., is the former Chairman of the Board of Directors and former CEO of Chiquita. Upon information and belief, the individual designated in the First Amended Complaint as a Moe defendant and in the Factual Proffer as Individual A is now known to be the defendant Cyrus Freidheim.[1] Freidheim knew of Chiquita's payments to the AUC and reviewed and authorized these payments.

---

[1] Chiquita submitted the Factual Proffer in 2007 in support for its guilty plea in the U.S. government's criminal prosecution of the company. In that case, Chiquita agreed to plead guilty to the felony of engaging in transactions with a Specially-Designated Terrorist Group (the AUC). As a basis for its guilty plea, Chiquita admitted as true the facts set out in the Factual Proffer.

159.    The Defendant Charles Keiser was the manager of Chiquita's operations in Colombia. He personally met with leaders of the AUC to initiate payments and, later, to arrange a system to hide Chiquita's payments to the AUC. [2]

### IV.    NON-PARTIES OF INTEREST[3]

160.    Chiquita Brands International, Inc. ("CBI" or "Chiquita"), is a United States-based corporation organized under the laws of the State of New Jersey. Its corporate headquarters are located in Cincinnati, Ohio. CBI is a leading international producer, distributor, and marketer of bananas and other produce; it is one of the largest banana producers in the world and a major supplier of bananas to Europe and North America. The company was founded in 1899 as the United Fruit Company, became the United Brands Company in 1970, and changed its name to Chiquita Brands International in 1990.

161.   On information and belief, at all times relevant herein, CBI wholly owned, dominated and controlled C.I. Bananos de Exportación, S.A. ("Banadex"), headquartered in Medellín, Colombia.  At all relevant times, Banadex produced bananas in the Urabá and Santa Marta regions of northeastern Colombia and, by 2003, was Chiquita's most profitable banana-producing operation globally.  At all times material herein, Banadex was an agent, alter ego, co-conspirator, and joint tortfeasor with CBI, with whom it cooperated in a joint criminal enterprise.

---

[2] The Defendants, along with Chiquita Brands International, Inc., Robert Olson, Robert Kistinger, William Tsacalis, and Carla A. Hills as personal representative of the estate of Roderick M. Hills, are named defendants in the active multidistrict litigation, *In re Chiquita Brands Int'l, Inc., Alien Tort Statute & Shareholder Derivative Litigation*, 792 F. Supp. 2d 1301 (S.D. Fla. 2011) ("*Chiquita* MDL"). These Defendants have contested personal jurisdiction in the Chiquita MDL, and Plaintiffs have requested a jurisdictional transfer to this District. Because Defendants refused to toll the statute of limitations until that transfer motion is decided, Plaintiffs now file this Complaint out of an abundance of caution to protect their rights.
[3] While not designated as individual defendants in this Complaint, the listed non-parties are among the defendants in the *Chiquita* MDL.

162.    Upon information and belief, the individual previously designated in the Factual Proffer as Individual B is now known to be the late Roderick M. Hills. The late Roderick M. Hills was the former Chiquita Director and President of the Audit Committee.  Mr. Hills knew of Chiquita's payments to the AUC and reviewed and authorized these payments. He implemented new procedures to hide payments to the AUC. He instructed Chiquita employees to continue making payments after learning that the payments were illegal.

163.    Upon information and belief, the individual designated in the Factual Proffer as Individual C is now known to be Robert Olson, former Vice President and General Counsel of Chiquita. Olson knew of Chiquita's payments to the AUC and reviewed and authorized these payments. Olson also reviewed and approved new procedures to hide payments to the AUC.

164.    Upon Information and belief, the individual designated in the Factual Proffer as Individual D is now known to be Robert Kistinger, former President and COO of Chiquita Fresh Group. Kistinger knew of Chiquita's payments to the AUC and reviewed and authorized these payments. Kistinger instructed Chiquita employees to continue making payments after learning that the payments were illegal.

165.    William Tsacalis, Controller and Chief Accounting Officer for Chiquita, knew about Chiquita's payments to convivrs and the AUC and designed the new procedures for payments to the AUC after it was designated as a Foreign Terrorist Organization.

166.    Tsacalis, Kistinger, Olson, and Hills when referred to herein collectively, will henceforth be designated "the Non-party Executives."

167.    Plaintiffs are ignorant of the true names and capacities of the individuals referred to herein as Moes 11 and 12.

168.    The alleged Moe 11 is a high-ranking officer of Banadex designated in the Factual

Proffer as Individual F.

169.    The alleged Moe 12 is a Banadex employee designated in the Factual Proffer as Individual G.

170.    Plaintiffs are informed and believe, and on that basis allege, that the Defendants and each fictitiously named Non-Party is responsible in some manner for the occurrences herein alleged and that the injuries to Plaintiffs herein alleged were proximately caused by the conduct of such Non-parties, in that each caused, conspired to cause, worked in concert to cause, participated in a joint criminal enterprise that caused, or aided and abetted the injuries complained of, and/or was the principal, employer, or other legally responsible person for the persons who caused, conspired to cause, worked in concert to cause, participated in a joint criminal enterprise that caused, and/or aided and abetted such injuries. Whenever and wherever reference is made in this Complaint to any conduct committed by Chiquita, CBI, and/or Banadex, such allegations and references shall also be deemed to mean the conduct of CBI and Banadex, acting individually, jointly and severally, through personnel working in the United States and Colombia for the benefit of CBI and Banadex.

171.    At all times herein material, with respect to the events at issue, Chiquita, Banadex, the Defendants, Non-party Executives, Moes 11 and 12 conspired with each other, and/or participated in a joint criminal enterprise with each other, and/or acted in concert, and/or aided or abetted each others' actions, and/or were in an agency or alter ego or joint venture relationship, and were acting within the course and scope of such conspiracy, joint criminal enterprise, concerted activity, aiding and abetting, and/or agency or alter ego or joint venture relationship. As described herein, "agency" includes agency by ratification. Whenever reference is made in this Complaint to any conduct by Chiquita, the Defendants, or any of the Non-party Executives,

such allegations and references shall be construed to mean the conduct of each of the abovenamed, acting individually, jointly, and severally.

172.  At all times herein material, with respect to the events at issue, Chiquita conspired with, worked in concert with, participated in a joint criminal enterprise with, acted as the principal of, employed, and/or aided and abetted the violent terrorist organizations responsible for Plaintiffs' injuries, including but not limited to the AUC.  These terrorist organizations were acting within the course and scope of such agency, employment, and/or concerted activity. The wrongful conduct alleged herein was perpetrated by Chiquita management and personnel, including the Defendants, both in Colombia and the United States.

**173.**    Plaintiffs are informed and believe and based upon such information and belief allege that CBI management and other personnel in the United States and in Colombia including the Defendants, Olson, Kistinger, Tsacalis and Hills were informed of the ongoing events complained of herein and participated in the decision making, planning, preparation, ratification, and/or execution of the acts complained of.

## V.    STATEMENT OF FACTS

### A. Chiquita Supported Paramilitary Terrorists in the Colombian Conflict.

174.    Chiquita supported terrorist groups in Colombia by paying them and assisting them to obtain arms and smuggle drugs.  Chiquita knew that these groups used illegal violence against civilians and intended that they employ this strategy to quell social and labor unrest in the Northeast Colombian region of Urabá and safeguard the stability and profitability of Chiquita's enterprises in Colombia.

175.    Among the terrorist organizations that Chiquita supported were two paramilitary groups, the Rural Self-Defense Group of Córdoba and Urabá (*Autodefensas Campesinas de Córdoba and*

*Urabá*, or ACCU) and its successor and parent, the United Self-Defense Groups of Colombia (*Autodefensas Unidas de Colombia*, or AUC).  Whenever reference is made in this Complaint to the AUC, such references shall be construed to mean the AUC, the ACCU, and any other predecessor or constituent part of the AUC.

176.    These paramilitaries operated in the banana-growing region of Urabá, an area located in the northeast corner of Colombia and South America, within the Department of Antioquia.

177.    Before the 1960s, the Urabá region was lightly populated, mostly by indigenous communities, and remained isolated from the central government.  The United Fruit Company, the predecessor to Chiquita, expanded to the Urabá region in the early 1960s and created a Colombian subsidiary, Banadex, which produced about ten percent of the region's bananas. Many workers migrated to the region as the banana industry grew.

178.    In the 1980s, two leftist, anti-government guerrilla groups, the Revolutionary Armed Forces of Colombia (*Fuerzas Armadas Revolucionarios de Colombia*, or FARC) and the National Liberation Army (*Ejercito Nacional de Liberacion*, or ELN), became active in Urabá.

179.    The paramilitaries were originally legally sanctioned "self-defense groups," authorized by a 1968 Colombian law to assist in the fight against the anti-government guerrillas, including the FARC and the ELN.  By 1991, however, the level of extrajudicial violence in which paramilitaries were implicated had become so great that the Colombian government adopted a new law criminalizing membership in and provision of support to the paramilitary groups.

180.    Over the course of the 1980s, the paramilitaries maintained strong ties to the Colombian government and increasingly worked for and with powerful private groups that were opposed by the leftist guerrillas, including businesses, industrialists, large landowners, and bankers.  They also became deeply involved in the drug trade, which gave them a steady source of income to

procure arms.  As a result, and despite the official criminalization of the paramilitaries, they became a central component of the government's strategy to win the civil war.  At all times relevant to this complaint, the AUC and other paramilitary groups in fact collaborated closely with the Colombian government and were used by the government to oppose anti-government guerrilla groups like the FARC.  *See infra*.  The AUC's efforts were directed toward the elimination of guerrillas and destroying the suspected bases of guerrilla support.  In that effort, they were supported by banana companies like Chiquita, who benefited directly from the suppression of suspected guerrilla sympathizers, such as labor union leaders.

181.     In the early 1990s, the largest and most well-organized paramilitary group in Colombia was the ACCU.  The organization was distinguished by its central command, which coordinated the activities of local subdivisions, known as "blocs" and "fronts."  Both mobile and stationary units existed, and fighters received a base salary and food, a uniform, weapons, and munitions. The commander-in-chief of the ACCU was Carlos Castaño, a long-time paramilitary fighter with family ties to the drug trade.  In 1997, Castaño and the ACCU sponsored a summit of the Self-Defense Groups of Colombia, bringing together regional paramilitaries from across the country. This summit led to the formation of the AUC, a national federation uniting Colombia's regional paramilitaries under Castaño's leadership.  At all times relevant to this Complaint, Castaño remained the leader of the AUC.

182.     The AUC grew rapidly in size during the late 1990s and into the twenty-first century.  In 1997, it comprised roughly 4,000 combatants.  By 2001, Castaño claimed that the AUC had 11,000 members, though government estimates put the number somewhere between 8,000 and 9,000. By 2002, AUC forces were present throughout Colombia.  AUC leaders have claimed that, at the time the process of demobilization began in 2004, the organization included as many

as 17,000 armed fighters and 10,000 other associates, including informants, cooks, drivers, and computer technicians.

183.    In order to undermine communities' and individuals' support for the guerillas, the AUC and its constituent groups, including the ACCU, adopted a strategy of terrorism, routinely engaging in death threats, extrajudicial killings, attacks on civilian populations, torture, rape, kidnapping, forced disappearances, and looting.

184.    While the AUC periodically engaged in direct combat with armed guerrilla forces, the vast majority of its victims were civilians.  The AUC claimed that it was justified in targeting civilians with no known ties to guerrillas because guerrilla groups required the logistical support of local towns in order to operate in the region. Carlos Castaño, the AUC leader, described this strategy as "quitarle agua al pez" (draining the water to catch the fish), as the AUC sought to intimidate and coerce civilians to prevent them from providing support to guerrillas.  Inhabitants of small towns in contested rural areas were particularly vulnerable to AUC attack.   AUC violence often caused entire communities to disperse, either due to threats of an impending massacre or in the wake of such massacres and the looting and destruction that commonly accompanied them.

185.    The AUC also targeted anyone considered to share the guerrillas' leftist ideology, such as teachers, community leaders and activists, trade unionists, human rights defenders, religious workers, and leftist politicians.  The banana companies shared the AUC's opposition to these individuals and organizations.  As part of its efforts to completely dominate the social and political life of the regions it controlled, the AUC also targeted anyone considered socially undesirable, including indigenous persons, persons with disabilities, persons with psychological problems, drug addicts, prostitutes, and suspected petty criminals.

186.    The abuses of the AUC and its constituent groups, including the ACCU, covered a large

area, affected a large population, and were carried out according to a systematic and well-

coordinated plan between the government, the paramilitaries, and the companies that financed

them.  These groups operated throughout the banana-growing region of Urabá, as well as in other

parts of Colombia.  On many occasions from at least 1994 through 2004, they carried out

multiple executions or mass-killings of civilians; by 1997, the ACCU and other AUC groups

were already responsible for at least 150 such instances of mass-killings. From its founding, the

AUC's activities and abuses have been carried out under the direction of a central command.

187.    At all times relevant to this complaint, the AUC and its constituent groups, including the

ACCU, participated in an internal armed conflict in Colombia, in which the paramilitaries were

fighting on behalf of the government against guerrilla forces.

188.    The AUC was subdivided into two blocs in Urabá, the Banana Bloc and the Elmer

Cárdenas Bloc. While there had been paramilitaries under the control of the Castaño family in

Urabá since the 1980s, the Banana Bloc was formally created in Urabá in 1994.  José Ever

Veloza García – a.k.a. "H.H." – was selected as one of the first commanders.  In later years, the

Banana Bloc operated through two fronts: the Turbo Front in Northern Urabá, under the

command of H.H., and the Banana Front in the south, led by Raúl Hasbún.

189.    The Elmer Cárdenas Bloc began as a private defense group that united with the ACCU in

1995.  It was commanded by Freddy Rendón Herrera – a.k.a. "El Alemán" – and Elmer Cárdenas

until Cárdenas was killed by the guerrillas in 1997.  The Elmer Cárdenas Bloc also received men,

training, and assistance from the Banana Bloc.  Both blocs received funding from the banana

companies, including Chiquita, directly or through the *Convivir* Papagayo.  *See infra* (*convivir*).

25

**B.  The *Convivir* Were Created to Legitimize and Provide Support to the Paramilitaries.**

190.    Although paramilitarism had been declared illegal in Colombia, the Colombian government still needed the paramilitaries to assist in the armed conflict against the guerillas; Decree 356 of 1994 was therefore enacted as a new legal mechanism to provide cover and a legitimate avenue of funding for the AUC.  Paramilitaries could easily reorganize and continue operating under Chapter 5 of this Decree, which allowed for the authorization of private groups to provide "Special Vigilance and Private Security Services."  These security groups, known commonly by their Spanish-language acronym "CONVIVIR," consisted of civilians who received a license from the government to "provide their own security. . . in areas of high risk or in the public interest, which requires a high level of security."  *Convivir* were permitted to use arms that were otherwise restricted to military use.

191.    The *convivir* units in Urabá were fronts for the AUC from their inception.  Many were directed and populated by known paramilitaries; this was common knowledge in the region.  As H.H. once remarked publicly, "Let us not deceive ourselves: all the *convivir* were ours."  The 17th Brigade of the Colombian Armed Forces, which was infamous for its close collaboration with the paramilitaries in Urabá, was given the authority to select members of the *convivir* in Urabá.  *See infra* (describing the close collaboration between the 17th Brigade and the paramilitaries).

192.    Álvaro Uribe, the current President of Colombia, was governor of Antioquia at the time of the creation of the *convivir*.  Uribe authorized the funding, arming, and funneling of information to the *convivir*, thereby facilitating the sharing of such funds, arms, and information with the AUC.  Uribe expected the *convivir* groups to fight the guerrillas – both alongside the military and on their own, since they were often in a position to engage their opponents before

troops could arrive.  He justified arming these groups with long-range weapons after noting that their revolvers and smaller weapons were insufficient to combat the guerrillas.

193.　　On information and belief, the impetus to organize *convivir* groups in Urabá came from Raúl Hasbún, a banana plantation owner who served as an intermediary between the banana companies and the AUC, and who eventually became commander of the AUC's Banana Bloc. Hasbún approached Uribe in 1997 with the intention of creating a *convivir* in Urabá.  The paramilitaries, the government, and the banana companies saw the *convivir* as an ideal means of legalizing the companies' payments to the paramilitaries.  In just a few months, Urabá had twelve *convivir* units.

194.　　The *convivir* units in Urabá facilitated communication and collaboration between the government and paramilitaries.  The twelve units functioned as a network and sent intelligence both to the military and to paramilitary commanders such as Hasbún.　The military and paramilitaries would both respond to information detailing the location of guerrillas, but often the military would allow the paramilitaries to take on the majority of the fighting, since the paramilitaries had better resources and fewer limitations on their conduct.

195.　　Chiquita and other banana companies often made payments to one unit, the *Convivir* Papagayo, which passed the money on to the AUC.  *See infra* (details on payment arrangements).

196.　　The banana companies recorded these as payments for "security services."  However, personnel of Chiquita and other banana companies both in the U.S. and Colombia knew that the *convivir* was directing these payments directly to the AUC.  *See infra* (meeting between Chiquita and paramilitaries; details on payment arrangements).

197.　　In 1997, the Colombian Constitutional Court affirmed the legality of the *convivir* system but prohibited *convivir* members from carrying restricted arms or conducting intelligence work.

Many *convivir* units were dismantled, as these limitations crippled their effectiveness.  The

*Convivir* Papagayo was one of only two *convivir* units that remained, as it remained useful as a

conduit for payments from Chiquita and other banana companies to the AUC.   Arnulfo Peñuela,

the director of the *Convivir* Papagayo at the time, is being prosecuted in Colombia for his ties to

the AUC.

### C. The AUC Acted Under Color of Authority of the Colombian Government in Committing the Acts Alleged Herein.

   *i) The AUC and other paramilitary groups were founded with the cooperation of the Colombian Government, and were assigned by the Government to combat left-wing guerrillas using methods that included using criminal violence against civilians and unions.*

198.   As part of the Colombian government's strategy for defeating the left-wing insurgency,

senior officials in the Colombian civilian government and the Colombian security forces

collaborated with the AUC and assisted the paramilitaries in orchestrating attacks on civilian

populations, extra-judicial killings, murders, disappearances, forced displacements, threats and

intimidation against persons including Plaintiffs.

199.   Paramilitarism was state policy in the Republic of Colombia.  Because the regular

military was unable to effectively address the FARC insurgency, the Colombian government

decided to facilitate the creation and funding of the AUC and other paramilitaries with the aim of

using this unofficial force to defeat the insurgency.

200.    As outside organizations placed increased pressure and scrutiny upon the military to

improve its human rights record, military leaders decided to leave much of their "dirty work" –

brutal violence against civilians and suspected guerrillas in violation of Colombian and

customary international law – to the paramilitaries.  Despite the fact that the AUC was a party to

the armed conflict and thus was subject to the laws of war, one commander of the AUC asserted, "the Colombian military felt itself bound to the Geneva Conventions. The AUC was not."

201.    As a result of this interdependence, longstanding and pervasive ties have existed between the paramilitaries and official Colombian security forces from the beginning. In the 1980s, paramilitaries were partially organized and armed by the Colombian military and participated in the campaigns of the official armed forces against guerrilla insurgents. Paramilitary forces included active-duty and retired army and police personnel among their members. Despite the 1989 Decree establishing criminal penalties for providing assistance to paramilitaries, the continued existence of military/paramilitary ties has been documented by Colombian non-governmental organizations, international human rights groups, the U.S. State Department, the Office of the U.N. High Commissioner for Human Rights, and the Colombian Attorney General's office. Cooperation with paramilitaries has been demonstrated in half of Colombia's eighteen brigade-level Army units, spread across all of the Army's regional divisions. Such cooperation is so pervasive that the paramilitaries are referred to by many in Colombia as the "Sixth Division" – a reference to their close integration with the five official divisions of the Colombian Army.

202.    Since 2006, considerable information on paramilitarism and the atrocities of the Colombian civil war has emerged as part of Colombia's Reparation and Reconciliation process. Largely using information derived from this process, Colombian authorities have charged members of Colombia's Congress, former lawmakers, the former head of the secret police, mayors and former governors with illegally collaborating with paramilitaries. According to testimony from Salvatore Mancuso, who succeeded Castaño as national commander of the AUC, Vice President Francisco Santos and Defense Minister Juan Manuel Santos met and collaborated with paramilitaries like Mancuso in a plot to extend the paramilitary model to Bogotá. Senior

officers in the Colombian military, including but not limited to former Military Forces Commanders Major General Manuel Bonett,  General Harold Bedoya, Vice Admiral Rodrigo Quinones, Gen. Jaime Uscategui; Gen. Rito Alejo Del Rio, General Mario Montoya, Colonel Danilo Gonzalez, Major Walter Fratinni and Defense Minister Juan Manuel Santos, collaborated with, facilitated, and/or aided and abetted the AUC in the commission of various attacks on civilian populations, extrajudicial killings and other atrocities against civilians, and/or gave tacit support to and acquiescence in the AUC's activities.  General Montoya was linked to Diego Murillo, the former leader of an AUC-affiliated paramilitary group in Medellín. Many other high-ranking staff officers are known to have had close ties to the AUC and other paramilitaries, thereby creating a haven for the paramilitary activity in the very heart of the military establishment.

203.    Boundaries between the AUC and the military at times were amorphous, as some paramilitary members were former police or army members, while some active-duty military members moonlighted as paramilitary members and became thoroughly integrated into these groups.  Paramilitary leaders noted that Colombian security forces in Urabá allowed members of the AUC to serve as proxies in their pursuit of guerrilla forces, largely due to the military's operative incapacity to defeat the guerrillas on its own.

204.    Colombian security forces in Urabá – with the knowledge and collaboration of high-level officials in the national government – have willfully failed to prevent or interrupt the crimes of the AUC, actively conspired with them, and coordinated activities with them. Documented examples in Urabá include:

- Allowing paramilitaries to establish permanent bases and checkpoints without interference, often within short distance of military bases for mutual support;

- Failing to carry out arrest warrants for paramilitary leaders, who move about the country freely;

- Withdrawing security forces from villages deemed sympathetic to guerrillas, leaving them vulnerable to attack by paramilitaries;

- Failing to intervene to stop ongoing attacks on civilian populations occurring over a period of days;

- Sharing intelligence, including the names of suspect guerrilla collaborators;

- Sharing vehicles, including army trucks used to transport paramilitary fighters;

- Supplying weapons and munitions;

- Providing special military training;

- Allowing passage through roadblocks;

- Providing support with helicopters and medical aid;

- Communicating via radio, cellular telephones, and beepers;

- Sharing members, including active-duty soldiers serving in paramilitary units and paramilitary commanders lodging on military bases; and

- Planning and carrying out joint operations.

205.   Accordingly, by late 1996, the AUC had become a major combatant in Colombia's civil conflict with the FARC. In most of the rural areas where the FARC had its strongholds, the Colombian military had ceded military operations to the AUC.  By 2001, the conflict between the AUC and the FARC had become a notorious exchange of atrocities.  The AUC became infamous for using tactics of terror on civilians living in and around areas that had been under FARC control, as a means of deterring support for the guerrillas and their ideologies.

*ii) The AUC consistently operated in Urabá with the cooperation, coordination, and assistance of the Colombian Government when attacking civilians.*

206.    It was in Urabá that a model of collaboration between the paramilitaries, the business sector, and the government was developed and perfected.  An alliance was formed between politicians, active military units, multinational companies, businessmen, and paramilitaries in order to impose a regime of terror and consolidate the dominance of the AUC, which would wrest control of the countryside back from the leftist guerrillas.  The first paramilitary groups to operate in Urabá in a systematic and continuous manner received special training from the Colombian military.

207.    When the government or the military was not able to legally arrest or attack civilians, they would delegate the task to the AUC or to *convivir* associated with the paramilitaries to act on their behalf.  These targets included suspected guerrilla sympathizers, including teachers, community leaders, trade unionists, human rights defenders, religious workers, and leftist politicians, as well as people with no known or suspected ties to the guerrillas but who were killed to terrify and dominate the civilian population.  According to both H.H. and Raúl Hasbún, the military gave the AUC lists of people to kill when they felt impotent to fight the guerrillas themselves legally and constitutionally, or when they could not arrest and try them for any crime.

208.    In addition to violently attacking civilians, the paramilitary performed other functions for the military in its war against the guerrillas.  For example, at times, the military and paramilitaries would cooperate to evict communities from their land.  In 2001, the paramilitaries carried out a food blockade in Urabá that severely affected the civilian population in an effort to "decrease the military capacity of the enemy."

209.    The AUC in Urabá consistently ran joint operations with the military.  The 17th Brigade of the Colombian Army, located in the Urabá region, and the 4th Brigade, sister unit to the 17th

Brigade in the Medellín region, were especially active in their support of and involvement in paramilitary activities, up to and including engaging in joint operations. For example, the Elmer Cárdenas Bloc of the AUC regularly received logistical support and transportation from the 17th Brigade and other units of the Colombian army and conducted joint operations with the 17th Brigade.

210.    General Rito Alejo del Río Rojas, the commander of the 17th Brigade from 1995 to 1997 who was responsible for military operations in Urabá, was notorious for his collaboration and collusion with paramilitaries in the region. H.H. has described General del Río as one of the most important factors in allowing the expansion of paramilitarism in Urabá, because of the cooperation and support he gave the AUC in the regions where the 17th Brigade operated and elsewhere. General del Río was known as the "father of the paramilitaries" because he gave them uniforms and military training.

211.    General del Río was finally arrested in 2008 and is currently in custody on a military base in Bogotá and is on trial for his collaboration with the AUC. He is accused of conspiracy to murders committed by paramilitaries in Urabá during his time as 17th Brigade Commander. H.H. has testified that he twice witnessed del Río meeting with the founder and national commander of the AUC, Carlos Castaño. Salvatore Mancuso testified that del Río met with him and other commanders to coordinate the paramilitaries' expansion throughout northern Colombia.

212.    AUC paramilitaries could enter and leave the 17th Brigade's headquarters at will, with the knowledge and permission of General del Río. In one instance, H.H. discovered that a criminal whom the AUC sought was being held at the Brigade headquarters; he and others from the AUC went to the 17th Brigade, picked up the prisoner, transported him to the port at Turbo using a military van, and murdered him. Salvatore Mancuso reported a similar story. Furthermore, on

his visits to the 17th Brigade – during which he often planned joint operations with General del Río and then-Captain Bayron Carvajal – H.H. was consistently allowed to recruit soldiers for the AUC.

213.    General del Río's role in promoting and supporting paramilitarism was not merely the work of a single rogue military officer; rather it was part of the Colombian government's strategy to fight the guerrillas.  On information and belief, many other army brigades had similar relationships with paramilitaries, including the 4th and 11th Brigades.

214.    Gloria Cuartas, then the mayor of Apartadó, and others complained repeatedly and provided evidence to the General's superiors about his collusion with paramilitaries, but their complaints were ignored.  Colonel Carlos Alfonso Velasquez Romero, a 17th Brigade officer, was investigated and discharged in January 1997 on the order of Army Commander Harold Bedoya when he tried to report on the General and the 17th Brigade's close association with the AUC.

215.    On information and belief, Colonel Anatolio Correa Figueroa and Colonel Santiago Parra Rubiano of the Urabá Police colluded with the AUC to block complaints against the AUC or their military collaborators from developing into investigations or prosecution.

216.    In October 1997, members of the Army's 4th Brigade established a perimeter around the village of El Aro, in Antioquia.  While the Army prevented entry and escape, members of the AUC entered the village and over a period of five days executed at least eleven people, burned most of the houses, looted stores, and destroyed pipes that fed the homes potable water.  Upon leaving the village, the paramilitaries forcibly disappeared over thirty more people and compelled most of the residents to flee.

217.    On February 19, 2000, the AUC selectively assassinated five banana workers in the "peace community" of San Jose de Apartadó, in Urabá; reports indicated that members of the 17th Brigade were direct participants in the attack.

218.    When asked to rank their collaboration between the AUC and the Colombian military on a scale of one to 10, with 10 being maximum collaboration, H.H. rated it as a 10, specifically citing the helpfulness of General del Río and Colonel Carvajal.

219.    This model of collaboration between the paramilitaries, the companies, and the government was so successful in Urabá that Raúl Hasbún explained it to Jorge 40, commander of the AUC in the Magdalena region, so he could implement it there.  Thereafter, the model spread to many other regions of Colombia.

iii) *The AUC took on numerous State functions in Urabá, including the maintenance of security and order, the disposition of personal and commercial disputes, the provision and regulation of social services, and the imposition of social rules.*

220.    Throughout Urabá, Santa Marta and other regions of Colombia, the AUC took on a wide variety of roles that are generally thought of as state functions.  In many urban areas, the AUC coexisted with civilian authorities and took on police and military functions, among others.  In some rural areas – and particularly on banana plantations – the paramilitaries were virtually the only public authority.

221.    The paramilitaries took on so many governmental functions in Urabá that it became a common saying in the area that "Here, paramilitaries and the State are the same thing."  It was the paramilitaries who would receive complaints from locals regarding criminal activity or conflicts with neighbors, and it was they who dispensed their brutal brand of justice in response.

222.    In addition to settling disputes between individuals, the AUC became involved in social issues.  The paramilitary organizations' involvement in residents' daily lives reached the extent

of intervention in domestic issues, disputes between neighbors, collection of debts, and truancy from school.

223.    The AUC was even able to control the roads; on information and belief, they were able to shut down stretches of the Pan-American Highway on some occasions in order to use it as a runway for planes arriving with weapons and ammunition and exporting drugs.

### D.  Chiquita Supported the AUC in Urabá.

224.    Chiquita, as the successor to the United Fruit Company and the United Brands Company, has been involved in the production and exportation of produce from Central and South American nations, including Colombia, for over a century. At all relevant times, Chiquita produced bananas in the Urabá and Santa Marta regions of Colombia.

225.    On information and belief, from no later than 1995 until at least 2004, Chiquita provided material support, including money and services, to the AUC and its predecessors.

226.    Chiquita's assistance helped the paramilitaries to consolidate as a decisive actor in the political, military, and social terrain of the banana region.  In exchange for its financial support to the AUC, Chiquita was able to operate in an environment in which labor and community opposition to their operations and policies was suppressed.

*i)     Chiquita regularly made payments to the AUC.*

227.    From 1995 until at least February 2004, Chiquita provided material support to the AUC in Urabá and Santa Marta.  By 1997, the AUC effectively controlled large swathes of territory – particularly in the towns and urban areas – as well as exerting influence in institutions such as labor organizations and local governments in these regions.

228.    In 1995 and 1996, Chiquita made payments to the ACCU's Banana Bloc.

229.     Chiquita paid the AUC nearly every month during the period 1997–2004, making over one hundred payments to the AUC totaling over $1.7 million. During those years, the AUC killed 3,778 people and displaced approximately 60,000 in its war on the guerrillas in Urabá.

230.     Chiquita's payments to the AUC were reviewed and approved by senior executives of the corporation, including the Defendants, Olson, Kistinger, Tsacalis and Hills and high-ranking officers, director and employees. Chiquita's senior executives knew that the corporation was paying the AUC and that the AUC was a violent, paramilitary organization led by Carlos Castaño.

231.     Some of Chiquita's payments were made directly to the AUC or to front organizations like the *Convivir* Papagayo.  The majority of direct payments were made in the form of checks written to the *convivir*, drawn on Banadex's Colombian bank account.  Chiquita concealed the nature of these payments by recording them in corporate books and records as "security payments" or payments for "security" or "security services."

232.     In September 2000, Olson was informed of the results of an investigation into Chiquita's payments to the AUC, which had been carried out by in-house Chiquita attorneys. Olson then reported the results to the company's Audit Committee. Both Defendant Friedheim and Hills were present at this meeting. By March 2002, Tsacalis had designed new procedures to disguise payments to the AUC. Olson, Hills and other individuals who had been present at the presentation of the investigation reviewed and implemented these procedures.

233.     Under the new procedures, Banadex executives Moe 11 and Moe 12 received checks with the intent that they would be withdrawn as cash and handed directly to the AUC.  Moe 11 received a check made to him personally and drawn on the Colombian bank accounts of Chiquita's subsidiary. Moe 11 then endorsed the check and Moe 11 or Moe 12 cashed it. Moe 12

hand delivered the cash to AUC personnel in Santa Marta. Corresponding tax liability was withheld and Moes 11 and 12 reported and paid income tax as if the payments were actually being made to them instead of the AUC.  Chiquita made payments in this way in order to conceal the fact that they were actually paying the AUC; it recorded these payments simply as income contributions.

234.   Chiquita formed an agreement with the AUC, paying them in exchange for their services in pacifying the banana-growing region and suppressing union activity.  This agreement specified that Chiquita would pay the paramilitaries a fixed amount for each box of bananas exported.

235.   At all relevant times, Chiquita knew that the AUC was a violent, terrorist paramilitary organization, as its brutal aims and tactics were well-known in Colombia as a central feature of the Colombian civil war. On September 10, 2001, the United States government designated the AUC as a Foreign Terrorist Organization ("FTO").  That designation was well-publicized in the American public media, including in the *Cincinnati Post* on October 6, 2001, and in the *Cincinnati Enquirer* on October 17, 2001, as well as in the Colombian media. Following the designation, from on or about September 10, 2001, through on or about February 4, 2004, Chiquita made 50 payments to the AUC totaling over $825,000.

236.   On or about September 12, 2001, Moe 12 paid the AUC in Urabá and Santa Marta by check in an amount equivalent to $31,847.

237.   On or about November 14, 2001, Moe 11 and Moe 12 paid the AUC in Urabá and Santa Marta by check in the amount equivalent to $56,292.

238.   On or about December 12, 2001, Moe 11 and Moe 12 paid the AUC in Urabá and Santa Marta by check in an amount equivalent to $26,644.

239.    On or about February 4, 2002, Moe 11 and Moe 12 paid the AUC in Urabá and Santa Marta by check in an amount equivalent to $30,079.

240.    On or about March 7, 2002, Moe 11 and Moe 12 paid the AUC in Urabá and Santa Marta by check in an amount equivalent to $25,977.

241.    On or about March 31, 2002, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in two equal payments in amounts equivalent to $3,689 each.

242.    On or about April 16, 2002, Moe 11 and Moe 12 paid the AUC in Urabá by check in an amount equivalent to $35,675.

243.    On or about May 15, 2002, Moe 11 and Moe 12 paid the AUC in Urabá by check in an amount equivalent to $10,888.

244.    On or about May 31, 2002, Moe 11 and Moe 12 paid the AUC Santa Marta in cash in two equal payments in amounts equivalent to $3,595 each.

245.    In or about June 2002, Moe 11 and Moe 12 began making direct cash payments to the AUC in the Santa Marta region of Colombia according to the procedures referenced in Paragraph 89.

246.    On or about June 11, 2002, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in three payments in amounts equivalent to $4,764, $6,670 and $6,269, respectively.

247.    On or about June 14, 2002, Moe 11 and Moe 12 paid the AUC in Urabá by check in an amount equivalent to $31,131.

248.    On or about July 2, 2002, Moe 11 and Moe 12 paid the AUC in Urabá by check in an amount equivalent to $11,585.

249.    On or about July 9, 2002, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in an amount equivalent to $5,917.

250.    On or about August 6, 2002, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in an amount equivalent to $4,654.

251.    On or about August 15, 2002, Moe 11 and Moe 12 paid the AUC in Urabá by check in an amount equivalent to $27,841.

252.    On or about September 2, 2002, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in an amount equivalent to $4,616.

253.    On or about October 7, 2002, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in an amount equivalent to $8,026.

254.    On or about October 15, 2002, Moe 11 and Moe 12 paid the AUC in Urabá by check in an amount equivalent to $40,419.

255.    On or about November 8, 2002, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in an amount equivalent to $6,164.

256.    On or about November 29, 2002, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in an amount equivalent to $5,685.

257.    On or about December 9, 2002, Moe 11 and Moe 12 paid the AUC in Urabá by check in an amount equivalent to $47,424.

258.    On or about January 21, 2003, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in an amount equivalent to $7,954.

259.    On or about January 27, 2003, Moe 11 and Moe 12 paid the AUC in Urabá by check in an amount equivalent to $22,336.

260.    On or about February 11, 2003, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in an amount equivalent to $7,291.

261.    In 2003, Chiquita consulted with attorneys from the District of Columbia office of a

national law firm ("outside counsel") about Chiquita's ongoing payments to the AUC.  Outside

counsel advised Chiquita that the payments were illegal under United States law and that

Chiquita should immediately stop paying the AUC directly or indirectly.  Among other things,

outside counsel advised Chiquita:

> "Must stop payments."
> (notes, dated February 21, 2003)
>
> "Bottom Line: CANNOT MAKE THE PAYMENT"
> "Advised NOT TO MAKE ALTERNATIVE PAYMENT through CONVIVIR"
> "General Rule: Cannot do indirectly what you cannot do directly"
> "Concluded with: CANNOT MAKE THE PAYMENT"
> (memo, dated February 26, 2003)
>
> "You voluntarily put yourself in this position. Duress defense can wear out through
> repetition. Buz [business] decision to stay in harm's way. CHIQUITA should leave
> Colombia."
> (notes, dated March 10, 2003)
>
> "[T]he company should not continue to make the Santa Marta payments, given the
> AUC's designation as a foreign terrorist organization[.]"
> (memo, dated March 11, 2003)
>
> [T]he company should not make the payment."
> (memo, dated March 27, 2003)

262.    Although CBI's Board of Directors agreed to disclose its payments to the AUC to the

U.S. Department of Justice on or about April 3, 2003, on or about April 4, 2003, according to

outside counsel's notes concerning a conversation about Chiquita's payments to the AUC, Olson

said, "His and Hills' opinion is just let them sue us, come after us. This is also Freidheim's

opinion." On April 8, 2003, Hills and Kistinger met with two Chiquita employees and Moes 11

and 12 and instructed them to continue making the payments to the AUC.  On April 24, 2003,

Hills and Olson, along with outside counsel, met with Justice Department officials, who told CBI

the payments were illegal.  Nonetheless, Chiquita continued to make the payments through Moes 11 and 12 until at least February 2004.

263.    On or about May 12, 2003, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in an amount equivalent to $6,105.

264.    On or about May 21, 2003, Moe 11 and Moe 12 paid the AUC in Urabá by check in an amount equivalent to $47,235.

265.    On or about June 4, 2003, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in an amount equivalent to $7,623.

266.    On or about June 6, 2003, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in two payments in amounts equivalent to $6,229 and $5,764, respectively.

267.    On or about July 14, 2003, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in an amount equivalent to $7,139.

268.    On or about July 24, 2003, Moe 11 and Moe 12 paid the AUC in Urabá by check in an amount equivalent to $35,136.

269.    On or about August 8, 2003, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in an amount equivalent to $5,822.

270.    On or about August 25, 2003, Moe 11 and Moe 12 paid the AUC in Urabá by check in an amount equivalent to $12,850.

271.    On or about September 1, 2003, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in an amount equivalent to $6,963.

272.    On or about October 6, 2003, Moe 11 and Moe 12 paid the AUC in Urabá by check in an amount equivalent to $18,249.

273.    On or about October 6, 2003, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash

in an amount equivalent $9,439.

274.    On or about October 24, 2003, Moe 11 and Moe 12 paid the AUC in Urabá by check in an amount equivalent to $30,511.

275.    On or about November 5, 2003, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in an amount equivalent to $6,937.

276.    On or about December 1, 2003, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in an amount equivalent to $6,337.

277.    On or about December 2, 2003, Moe 11 and Moe 12 paid the AUC in Urabá by check in the amount equivalent to $30,193.

278.    On or about January 9, 2004, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in an amount equivalent to $10,630.

279.    On or about January 13, 2004, Moe 11 and Moe 12 paid the AUC in Urabá by check in an amount equivalent to $27,958.

280.    On or about February 4, 2004, Moe 11 and Moe 12 paid the AUC in Urabá by check in an amount equivalent to $4,795.

281.    On March 19, 2007, Chiquita pled guilty in U.S. District Court for the District of Colombia to one count of engaging in transactions with a specially designated global terrorist. The company's sentence included a $25 million criminal fine, the requirement to implement and maintain an effective compliance and ethics program, and five years' probation.

    ii)     *Chiquita facilitated the AUC's arms shipments.*

282.    In 2001, Chiquita facilitated the clandestine and illegal transfer of arms and ammunition from Nicaragua to the AUC.

283.    The Nicaraguan National Police and Army were involved in a deal that provided 3,000 AK-47 assault rifles and 5 million rounds of ammunition to a private Guatemalan arms dealership, Grupo de Representaciones Internationales S.A. ("GIR S.A."), in exchange for weapons more suited to police work.  GIR S.A., in turn, arranged to sell the AK-47s and ammunition for $575,000 to Shimon Yelinek, an arms merchant based in Panama.  In November 2001, Yelinek loaded the arms onto the *Otterloo*, a Panamanian-registered ship, with Panama as its declared destination.

284.    Instead of docking in Panama, the *Otterloo* instead went to Turbo, Colombia, where Chiquita, through Banadex, operated its own private port facility for the transport of bananas and other cargo.

285.    After the *Otterloo* docked at Chiquita's port in Turbo, Banadex employees unloaded the crates containing the rifles and ammunition. On information and belief, the AUC, which had free access to the port, then loaded these rifles onto AUC vehicles and took possession of them.

286.    Chiquita was aware of the use of its facilities for the illegal transshipment of arms to the AUC, and intended to provide such support and assistance to the AUC.  The documents accompanying the shipment declared that the crates that in fact contained arms were filled with plastic and/or rubber balls.  However, in unloading the crates, the Banadex employees used heavy lifting machinery that would not have been necessary to move the crates' declared cargo. After being off-loaded, the crates remained at Chiquita's facilities for at least two additional days before fourteen AUC vehicles arrived to take possession of the arms.  At least some of the arms were received by Freddy Rendón Herrera, the commander of the Elmer Cárdenas Block of the AUC in Urabá.

44

287.    Giovanny Hurtado Torres, a highly-placed Chiquita employee from the port at Turbo, and several Colombian customs officials have been prosecuted for their purposeful involvement in the *Otterloo* transaction.

288.    On information and belief, Chiquita facilitated at least four other arms shipments to the AUC; one of these shipments of arms through Chiquita's port involved the entry of 4,200 assault rifles.

289.    On at least one occasion, José Leonardo Lopez Valencia, an electrical mechanic at Turbo, witnessed uniformed AUC members offloading crates directly from a Chiquita ship.  On information and belief, those crates contained smuggled firearms.

290.    In an interview with the Colombian newspaper *El Tiempo*, AUC leader Carlos Castaño subsequently boasted, "This is the greatest achievement by the AUC so far. Through Central America, five shipments, 13 thousand rifles."

291.    The arms that Chiquita knowingly and intentionally aided the AUC to procure have been of substantial assistance to the AUC in its commission of untold crimes, including the killings and other conduct alleged herein.  Many of these guns have not been turned in to the government and are still in use by the paramilitaries.  In 2008, some were seized in Urabá from the Daniel Rendón Herrera's 'Heroes de Castaño' Front – another AUC subunit.  The raid, executed by Colombian authorities, netted hand grenades, mortar rounds, Claymore mines, electrical detonators, and 47 AK-47 assault rifles; the assault rifles were traced to the 2001 *Otterloo* shipment.

        *iii)    Chiquita facilitated the AUC's drug shipments.*

292.    Chiquita also assisted the AUC by allowing the use of its private port facilities for the illegal exportation of large amounts of illegal drugs, especially cocaine. The drug trade was a

major source of income for the AUC, and Chiquita allowed the AUC access to its port facilities and ships for the purpose of smuggling drugs.

293.    Colombian prosecutors have charged that the AUC shipped drugs on Chiquita's boats carrying bananas to Europe.  According to H.H., the AUC would tie drugs to the hulls of banana ships at high sea to evade the control points of the security agencies.

294.    Cocaine hidden in Chiquita's banana shipments has been seized by the Colombian government on seven separate occasions.  More than one and one-half tons of cocaine have been found hidden in Chiquita's produce, valued at over 33 million dollars.  Two of the ships on which drugs were found were named the *Chiquita Bremen* and the *Chiquita Belgie*.

295.    On information and belief, drug shipments could not have been attached to Chiquita's banana boats without the active collusion or willful ignorance of Chiquita employees.  Chiquita could have prevented this drug trade and assistance to the AUC, but knowingly and purposely allowed use of its port and banana transportation boats for this purpose.

### E.  Chiquita's Conduct Aided and Abetted the AUC's Conduct Alleged Herein.

296.    Chiquita's conduct aided and abetted the killings and other conduct alleged herein, which constitute war crimes; crimes against humanity; torture; cruel, inhuman and degrading treatment; violations of the rights to life, liberty and security of person and peaceful assembly and association; and terrorism, among other violations of Colombian, New Jersey, Florida, United States, and customary international law.  Chiquita 1) substantially assisted the AUC paramilitaries who personally undertook the wrongful acts alleged herein, and 2) knew that its actions would assist in the wrongful acts at the time it provided the assistance.

   i)  *Chiquita substantially assisted the persons who personally committed the acts comprising Plaintiffs' claims.*

46

297.    Chiquita's payments and facilitation of drug shipments contributed significantly to the perpetration of the crimes committed by the AUC by improving the AUC's financial situation and enabling it to purchase weapons and other war materiel.  *See supra* (Chiquita's support to the AUC).

298.    In addition to Chiquita's payments and facilitation of drug shipments, its assistance to the AUC in smuggling arms substantially and directly increased the paramilitaries' capacity to carry out its violent campaign against Urabá's civilian population.  *See supra* (smuggling of arms was major AUC achievement)

299.    Most of the firearms that were transferred to the AUC from the *Otterloo* shipment have never been recovered.  On information and belief they and other similarly obtained firearms have been used in the commission of war crimes, crimes against humanity, and other violations, including those alleged in this complaint.  *See supra* (*Otterloo* shipment).

*ii) Chiquita knew and intended that its actions would assist in the illegal or wrongful activity at the time it provided the assistance.*

300.    Chiquita knew that its actions would assist the AUC to continue killing, torturing, and committing other acts of illegal violence against civilians in Urabá.  The AUC's use of violent tactics, including extrajudicial killings, to terrorize innocent civilians living in areas under FARC control was well known in Colombia and was widely reported in the press in Colombia and the United States.  In 1997, for example, the State Department noted:

> "[t]he many paramilitary groups took the offensive against the guerrillas, often perpetrating **targeted killings, massacres, and forced displacements of the guerrillas' perceived or alleged civilian support base** . . . **An active policy of depopulation, pursued by some paramilitary groups against communities suspected of guerrilla support**, was the primary cause of the growing internal displacement problem."

United States Department of State, *1997 Human Rights Report: Colombia*, at 2 (emphasis added).

301. In 1999, the State Department noted:

> Paramilitary groups and guerrillas were responsible for the vast majority of political and extrajudicial killings during the year. Throughout the country, paramilitary groups **killed, tortured and threatened civilians suspected of sympathizing with guerrillas in an orchestrated campaign to terrorize them into fleeing their homes, thereby depriving guerrillas of civilian support**. The AUC paramilitary umbrella organization . . . exercised increasing influence during the year, extending its presence through violence and intimidation into areas previously under guerrilla control.

United States Department of State, *1999 Human Rights Report: Colombia*, at 2 (emphasis added).

302. The United States government designated the AUC as a Foreign Terrorist Organization on September 10, 2001, and that designation was well-publicized in the American public media. *See supra* (US media coverage). The AUC's designation was even more widely reported in the public media in Colombia, where Chiquita had its substantial banana-producing operations.

303. Chiquita had information about the AUC's designation as a Foreign Terrorist Organization specifically and global security threats generally through an Internet-based, password-protected subscription service that Chiquita paid money to receive. On or about September 30, 2002, an employee of Chiquita, from a computer within Chiquita's Cincinnati headquarters, accessed this service's "Colombia – Update page," which contained the following reporting on the AUC:

> US terrorist designation. International condemnation of the AUC human rights abuses culminated in 2001 with the US State Department's decision to include the paramilitaries in its annual list of foreign terrorist organizations. This designation permits the US authorities to implement a range of measures against the AUC, including denying AUC members US entry visas; freezing AUC bank accounts in the US; and barring US companies from contact with the personnel accused of AUC connections.

304. From on or about September 10, 2001, through on or about February 4, 2004, Chiquita made 50 payments to the AUC totaling over $825,000.  Chiquita never applied for nor obtained

any license from the Department of the Treasury's Office of Foreign Assets Control with respect to any of its payments to the AUC.

305.    On or about February 20, 2003, Olson and an in-house attorney had a conversation about the AUC's designation by the United States government as a Foreign Terrorist Organization. Shortly thereafter, Olson and the Chiquita lawyer spoke with outside counsel about Chiquita's ongoing payments to the AUC.   Outside counsel advised Chiquita, through Olson and the in-house lawyer, that the payments were illegal under United States law and that Chiquita should immediately stop paying the AUC directly or indirectly. *See supra* (advice of counsel about payments to the AUC).

306.    Despite the February 26, 2003 communication from counsel advising Chiquita's executives against making payments to the AUC, on or about February 27, 2003, two Chiquita employees in Colombia paid the AUC in Urabá by check in an amount equivalent to $17,434.

307.    Despite the March 27, 2003 communication from counsel advising Chiquita executives against making payments to the AUC, on or about March 27, 2003, the same two employees paid the AUC in Urabá by check in an amount equivalent to $19,437.

308.    Chiquita's acts of assistance to the AUC were made with the intent that the AUC continue carrying out acts of killing, torture, and other illegal violence against the civilian population of Urabá in accordance with the AUC's strategy for suppressing the FARC and deterring its sympathizers.  In exchange for its financial support to the AUC, Chiquita was able to operate in an environment in which labor and community opposition was suppressed. Chiquita's assistance was not given out of duress; rather it was part and parcel of the company's proactive strategy to increase profitability and suppress labor unrest by exterminating the FARC in the Urabá region.

309.    Chiquita, along with other banana companies in Colombia, sought a meeting with the paramilitaries in late 1996 or early 1997. The meeting took place in Medellín, and a high-level U.S. Chiquita employee, most likely Defendant Keiser, was present.  It was decided at this meeting that the banana companies would pay the paramilitaries. Carlos and Vicente Castaño led the negotiations with the companies; as a result of the negotiations, H.H. was ordered to patrol large swathes of the banana-growing region.

310.    Defendant Keiser personally met with leaders of the AUC and planned a system of payment. On information and belief, in order to operate its banana production in an environment free of labor opposition and social disturbances, Chiquita agreed to a whereby the company would pay the AUC a certain amount per box of banana exported, and would help to arm and otherwise support the AUC and other terrorist groups during the period of the killings and other conduct alleged herein.

311.    The arrangement between Chiquita and the AUC was not one of duress; in fact, it was the banana companies that approached the AUC to initiate their relationship.  Mario Iguaran, the former Attorney-General of Colombia, has charged that there was a criminal relationship between Chiquita and the AUC in which Chiquita supplied money and arms to the AUC in return for the "bloody pacification of Urabá."

312.    As part of its deal with Chiquita, the AUC provided protection services to banana plantations, dealing out reprisals against real or suspected thieves, as well as against social undesirables, suspected guerrilla sympathizers or supporters, and anyone who was suspected of opposing the AUC's activities or social program.

313.    By arming and financing the AUC, Chiquita intended to benefit from the AUC's systematic killings of civilians. After its agreement with Chiquita, the AUC understood that one

goal of its campaign of terror was to prevent work stoppages in the banana plantations.  Anyone who disrupted the smooth operations of the plantations knew what the consequences could be. For example, one individual who worked in Chiquita's offices at a plantation in Urabá was present when paramilitaries arrived at the plantation and summarily executed a banana worker who had been seen as a troublemaker because his slow work held up the production line. Another individual saw paramilitaries arrive to threaten banana workers after a salary dispute.

314.    In concert with the army, which assisted banana growers by occupying banana plantations and arresting union leaders or forcing laborers to work during strikes, the AUC undertook an extensive campaign of murdering civilians in order to break the back of the unions. According to Gloria Cuartas, "They pulled out a map where they said which plantations allegedly had a FARC presence and started killing workers and union members, until the organizational structures of the union and the board of Sintrainagro [the local union of planattion workers] were left totally in the hands of the 'Esperanzados' [the ELN]." By that time, the ELN, which had previously been an anti-government guerrilla group, had been coopted by the paramilitaries

315.    Chiquita's assistance also helped the AUC to gain access to its perceived opponents who worked for the company.  José Gehiener Arias Ramirez, a Chiquita employee who was later killed by the AUC, repeatedly witnessed AUC members entering the Chiquita packing house to threaten workers from the Barrio Policarpa, whose residents were viewed as hostile to the AUC.

316.    The stability and social control provided by the AUC was to Chiquita's benefit, in that it minimized the expenses incurred and eliminated disruptions in the exportation of bananas.  As a result of the AUC's actions, Chiquita was able to dismantle social assistance programs to which the banana companies had agreed through negotiations with the unions in the 1980s, thereby

lowering its production costs.  The influence of the AUC in the leadership of the banana workers' trade unions was also to Chiquita's benefit, as it reduced labor strife.

317.    As a result of the paramilitaries' intervention, Castaño was able to brag in 2001 that "**in the past three years there have been no strikes** in the banana-growing region, and the Sintrainagro unions work shoulder-to-shoulder with the employers to promote the [economy of the] zone." Carlos Castaño, *Mi Confesión* (emphasis added).

318.    In addition to directly suppressing labor activity, the paramilitaries regulated the banana-growing population and protected Chiquita's profitability by controlling the provision of medical services in the towns of Urabá.  Residents of Apartadó reported that they feared seeing doctors because they believed that medical personnel were under the control of the AUC.  On information and belief, this arrangement benefited Chiquita because it allowed the paramilitaries to inform the company of its employees' medical issues that could potentially affect labor productivity, including pregnancy.  It also allowed the paramilitaries to prevent doctors from certifying worksite injuries or providing medical excuses to workers, which would have raised costs for the company.

### F.  Chiquita Joined the AUC's Conspiracy to Commit the Acts Alleged Herein.

319.    By its conduct, Chiquita joined the AUC's conspiracy to eliminate the FARC through violent attacks on guerrillas and suspected guerrilla sympathizers and terrorization of the civilian population.  The killings alleged herein, which constitute war crimes; crimes against humanity; torture; cruel, inhuman and degrading treatment; violations of the rights to life, liberty and security of person and peaceful assembly and association; and terrorism, among other violations of Colombian, New Jersey, Florida, United States, and customary international law, were committed by members of the AUC in furtherance of the conspiracy.  Chiquita's actions

constituted conspiracy in that (1) two or more members of the AUC agreed to carry out their terrorist campaign against civilians, (2) Chiquita joined the conspiracy knowing of at least one of the goals of the conspiracy and intending to help accomplish it, and (3) one or more of the violations alleged herein was committed by someone who was a member of the conspiracy and acted in furtherance of the conspiracy.

> i)  *Members of the AUC agreed to fight the FARC by means of illegal violence against particular classes of civilians, thereby constituting a conspiracy of two or more persons who agreed to commit a wrongful act.*

320.   The AUC was formed based on agreement between its leaders, government backers, and private supporters, to eliminate the FARC through extermination of guerrillas and suspected guerrilla sympathizers and the systematic terrorization of the civilian population.  The AUC purposely targeted civilians, even those with no known ties to the guerrillas.  Thus the use of illegal, violent means, including war crimes and extrajudicial killings, was always central to the group's mission and strategies.

> ii)  *Chiquita joined the conspiracy knowing that the AUC intended to fight the FARC by means of illegal violence against particular classes of civilians, and intending to help accomplish that goal.*

321.   Chiquita began conspiring with the paramilitaries in 1995 or earlier; its first direct payments to the Banana Bloc of the ACCU were made no later than 1995.  Chiquita sought a meeting with the paramilitaries in late 1996 or early 1997 and concluded an agreement with the AUC whereby Chiquita paid the paramilitaries for their services supporting the banana plantations.  These services consisted of threatening or killing civilians, including workers who attempted to strike, union leaders, alleged criminals, and small banana farmers who refused to sell or abandon their land. *See supra.*

322.    Chiquita knew of the AUC's goal of eliminating the FARC through the killing of suspected sympathizers and innocent civilians.  They also knew of their primary tactic of targeting civilians in order to intimidate this population from supporting the FARC.  *See supra* (Chiquita's knowledge).  Chiquita joined the conspiracy intending to benefit from the AUC's strategy; the AUC's methods would reduce Chiquita's costs and risk exposure by suppressing labor unrest through the elimination of those who opposed the banana plantations or threatened their profitability.

323.    Chiquita, as a co-conspirator, arranged illegal money payments, smuggled drugs and arms, and facilitated and condoned murders in furtherance of the conspiracy.

iii) *The AUC's conduct alleged herein was committed by members of the AUC in furtherance of the conspiracy's goal of fighting the FARC by means of illegal violence against particular classes of civilians.*

324.    All of Plaintiffs' decedents were killed by the AUC in furtherance of the conspiracy. Their status as social activists, unionists, alleged criminals, or victims of FARC extortion led to their inclusion in groups perceived by the AUC and the State as being sympathetic to the FARC and ultimately to their murders.  *See infra* (Plaintiffs' Injuries).

**G.  The AUC Acted as Chiquita's Agent in Committing the Acts Alleged Herein.**

325.    Chiquita formed an agreement with the AUC, paying them in exchange for their performance of inherently dangerous and tortious activities: the suppression of union activity and elimination of alleged FARC supporters and other undesirables.  This agreement specified, among other things, that Chiquita would pay the paramilitaries a fixed dollar amount for each box of bananas exported.  *See supra* (Chiquita's support to the AUC, Chiquita's agreement with the AUC).

326.    Chiquita's intended that the AUC continue carrying out acts of killing, torture, and other illegal violence against the civilian population of Urabá in accordance with the AUC's strategy for suppressing the FARC and deterring its sympathizers.  In providing the AUC with money and assistance with their arms and drug trafficking, Chiquita, the Defendants, and Non-Party Executives intended that the AUC obtain arms and continue their practice of killing civilians, especially those civilians who were perceived as threats to the profitability of the banana industry.  *See supra* (intentional assistance and benefits to Chiquita).

327.    The leadership of the AUC did, in fact, carry out killings of union members, social organizers and other undesirable groups, as well as civilians with no known or suspected ties to the guerrillas, knowing that Chiquita expected and intended that they do so using the arms and money provided by Chiquita.

328.    The AUC solved Chiquita's labor problems and kept down operational costs by killing and/or intimidating any worker that attempted to strike. *See supra* (suppression of labor was part of agreement).  The paramilitaries also dealt out reprisals against real or suspected thieves and social undesirables, and targeted suspected guerrilla sympathizers or supporters who could have threatened Chiquita's operations, including independent business cooperative owners and anyone espousing views that could be characterized as leftist, such as opposition politicians, vocal trade unionists, community leaders, and social activists. *See infra* (Plaintiffs' Injuries).

329.    Chiquita authorized the AUC's strategy of killing, torture, and other illegal violence against civilians in Urabá.  The AUC's agreement with Chiquita involved forcing people to work using threats and illegal violence, as well as the quelling of labor and social unrest through the systematic terrorization of the population of Urabá.  *See supra* (Chiquita's agreement with the AUC).

330.    Furthermore, Chiquita acquiesced in the AUC's conduct after the fact by continuing to pay them – and finding new ways to conceal the nature of those payments – despite full knowledge that their support was being used to carry out the crimes alleged herein.  *See supra* (knowledge of AUC as terrorist group, illegality of payments).

## VI.    PLAINTIFFS' INJURIES

*John Doe 1/John Doe 2*

331.    John Doe 1's father, John Doe 2, was a banana worker in Urabá and active in labor organizing. In 2001, the area in which he lived was effectively controlled by the AUC.

332.    In 2001, John Doe 2 was traveling by bus from his home to the banana farm. The bus was stopped by AUC paramilitaries. The paramilitaries removed John Doe 2 from the bus and executed him.

333.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the death of John Doe 2 through its support of the AUC in Urabá. On information and belief, Chiquita benefited from the death of John Doe 2 by removing a labor activist who threatened the stability of Chiquita's operations.

*Jane Doe 1/Jane Doe 2*

334.    Jane Doe 1's mother, Jane Doe 2, lived in a town in Urabá with her family. She was involved in civic, social and political activities, including advocating for marginalized groups. As a community activist, she was a member of one of the groups targeted by the AUC and the Colombian state in their war against the FARC and perceived FARC sympathizers.

335.    In 1998, Jane Doe 2 told Jane Doe 1 that she was afraid she would be killed for her activities. Approximately one week later, AUC paramilitaries arrived at Jane Doe 2's house. In

the presence of her family, the paramilitaries removed Jane Doe 2 from her house and executed her. Subsequently, the family of Jane Doe 2, including Jane Doe 1, fled their community in fear.

336.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the death of Jane Doe 2 through its support of the AUC in Urabá.  On information and belief, Chiquita benefited from the death of Jane Doe 2 by removing a social activist who was seen as threatening the stability of Chiquita's operations and the generally established social order.

*John Doe 3/John Doe 4*

337.    John Doe 3's brother, John Doe 4, was a banana worker at a plantation in Urabá, and a leader of a labor union committee.

338.    In 1998, John Doe 4 was involved in a protest against low wages. John Doe 3 and John Doe 4 were eating lunch at their banana plantation when AUC paramilitaries approached John Doe 4, identified him by name, and executed him.

339.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the death of John Doe 4 through its support of the AUC in Urabá.  On information and belief, Chiquita benefited from the death of John Doe 4 by removing a labor activist who threatened the stability of Chiquita's operations.

*Jane Doe 3/John Doe 5*

340.    Jane Doe 3's husband, John Doe 5, was a banana worker in Urabá.

341.    In 1997, John Doe 5 became a target of AUC paramilitaries because they accused him of paying ransom to the FARC for his kidnapped brother. The AUC took John Doe 5 from his

banana farm and executed him.  AUC paramilitaries subsequently told John Doe 5's family that they had killed him.

342.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the death of John Doe 5 through its support of the AUC in Urabá. On information and belief, Chiquita benefited from the death of John Doe 5 by strengthening the AUC itself, in sending a message that payment of revenue to AUC opponents such as the FARC would be dealt with harshly.

*Minor Does 1–4/John Doe 6/Jane Doe 4*

343.    The mother of Minor Does 1–4, Jane Doe 4, lived in a town in Urabá with her family. She was a civic and social activist.  As a community activist, she was a member of one of the groups targeted by the AUC and the Colombian state in their war against the FARC and perceived FARC sympathizers.

344.    In 2004, AUC paramilitaries came to Jane Doe 4's house and executed her in the presence of her family. Subsequently, the family of Jane Doe 4, including Minor Does 1–4, fled their community in fear.

345.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the death of Jane Doe 4 through its support of the AUC in Urabá. On information and belief, Chiquita benefited from the death of Jane Doe 4 by removing a social activist who was seen as threatening the stability of Chiquita's operations and the generally established social order.

*John Doe 7/John Doe 8*

346.    John Doe 7's son, John Doe 8, was a banana worker at a plantation in Urabá.

347.     In 2000, John Doe 8 was accused by AUC paramilitaries of stealing from a banana farm. John Doe 8 was taken by an AUC paramilitary commander and executed.

348.     When John Doe 7 approached the AUC about the killing, the commander said that they had killed John Doe 8 because the AUC were guarding the farm and were responsible for preventing thefts, and suggested that they had eliminated a social undesirable.  The commander also threatened John Doe 7 about pursuing an investigation.

349.     On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the death of John Doe 8 through its support of the AUC in Urabá. On information and belief, Chiquita benefited from the death of John Doe 8 by sending a message that stealing from banana farms would result in being put to death without benefit of any judicial process.

*Jane Doe 5/John Doe 9*

350.     Jane Doe 5's husband, John Doe 9, was a local union leader, a member of the national union organization, and a member of a political party that opposed the AUC.

351.     In July 1997, AUC paramilitaries stopped him while he rode his motorbike.  After speaking with him, they tortured, decapitated, and dismembered him.

352.     A demobilized member of the AUC has confessed to the murder of John Doe 9.

353.     On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the death of John Doe 9 through its support of the AUC in Urabá. On information and belief, Chiquita benefited from the death of John Doe 9 by removing a labor activist who threatened the stability and profitability of Chiquita's operations.

*Jane Doe 6/John Doe 10*

354.    Jane Doe 6's husband, John Doe 10, was part of the leadership of an independent banana cooperative.

355.    One day in May 1999, John Doe 10 was participating in a soccer game.  After the game finished, two AUC paramilitaries sought him out and kidnapped him.  He was found the next day, dead, with six bullet wounds.

356.    In 1999 alone, four other members of the same banana cooperative were assassinated.

357.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the death of John Doe 10 through its support of the AUC in Urabá.  On information and belief, Chiquita benefited from the death of John Doe 10 by sending a message that independent banana farms that threatened Chiquita's profitability would not be tolerated.


*Jane Doe 7/John Doe 11*

358.    Jane Doe 7's husband, John Doe 11, was a union leader and a banana worker.  He was a member of the joint committee of workers and management that negotiated salaries and working conditions on a banana farm.

359.    In June 1999, men who identified themselves as AUC paramilitaries arrived at John Doe 11's home and killed him with a knife.

360.     On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the death of John Doe 11 through its support of the AUC in Urabá.  On information and belief, Chiquita benefited from the death of John Doe 11 by removing a labor activist whose actions threatened the stability and profitability of Chiquita's operations.


*Jane Doe 8/John Doe 12*

361.     John Doe 12, was the owner of a small banana plot in Urabá, near to the port in Turbo, which was used to ship bananas and was also controlled by the AUC.

362.     In September 2004, four members of the AUC arrived at John Doe 12's home and murdered him in front of his son.

363.     John Doe 8 is filing on behalf of his father, John Doe 12.

364.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, benefited from and/or aided and abetted the death of John Doe 12 through their support of the AUC in Urabá. On information and belief, Chiquita and the Defendants benefited from the Death of John Doe 12 by removing the owner of a small banana plot, thereby improving the chances for expanding Chiquita's operations.

*Jane Doe 9 /John Doe 13*

365.     John Doe 13, was a community leader who was murdered by the AUC in November 2003. John Doe 13 was traveling from Nueva Colonia to Apartadó with Jane Doe 13 when their vehicle was stopped by the AUC. The paramilitaries made him get out, and then killed him in front of his wife.

366.     John Doe 13's daughter was raped at her father's funeral, and subsequently became pregnant.

367.     Jane Doe 9 is filing on behalf of her husband, John Doe 13.

368.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, benefited from, and/or aided and abetted the death of John Doe 13 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 10/John Doe 14/John Doe 15*

61

369.     John Does 14 and 15 were killed by the AUC in November 2002. A demobilized member of the AUC confessed to both of their killings. John Doe 15 was a banana worker on a farm in Apartado and was killed by two members of the AUC known as "Jhon Jairo" and "El Cholo."

370.     Jane Doe 10 is filing on behalf of her sons, John Does 14 and 15.

371.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, benefited from, and/or aided and abetted the deaths of John Doe 14 and 15 through their support of the AUC in Urabá, which at the time of the events was in control of the region.


*Jane Doe 11/Jane Doe 12*

372.     Jane Doe 12, was murdered by the AUC in a public market in March 2002. A member of the AUC confessed to the killing.

373.     Jane Doe 11 is filing on behalf of her sister, Jane Doe 12.

374.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of Jane Doe 12 through their support of the AUC in Urabá, which at the time of the events was in control of the region.


*Jane Doe 13/John Doe 16*

375.     John Doe 16, was murdered by the AUC – in his mother's home and in front of his son – in Apartado in September 1999. John Doe 16 was a banana worker on a farm in Santa Marta.

376.     Jane Doe 13 is filing on behalf of her partner, John Doe 16.

377.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 16 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 14/John Doe 17*

378.    John Doe 17, was murdered by the AUC in Apartado in February 1998. John Doe 17 was a councilman and community leader, in a neighborhood of banana workers. After a meeting with community leaders in the Obrero neighborhood, John Doe 17 was ambushed by a group of armed men on his way home.

379.    Jane Doe 14 is filing on behalf of her partner, John Doe 17.

380.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 17 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

381.    On information and belief, Chiquita and the Defendants benefited from the death of John Doe 17 by removing a community leader whose actions threatened the stability and profitability of Chiquita's operations.


*Jane Doe 15/John Doe 18*

382.    John Doe 18, was murdered by the AUC. John Doe 18 was a labor leader and a political leader of the Union Patriotica political party. The AUC detained, tortured, decapitated and murder him in the Carambolos region.

383.    Jane Doe 15 is filing on behalf of her husband, John Doe 18.

384.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 18 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

385.    On information and belief, Chiquita and the Defendants benefited from the death of John

Doe 18 by removing a community leader whose actions threatened the stability and profitability of Chiquita's operations.

*Jane Doe 16/John Doe 19*

386.    John Doe 19, was murdered by the AUC in June 1997 in Apartado. John Doe 19 worked as a wood-cutter. Members of the AUC showed up at his house and threatened the people there, asking for John Doe 19's whereabouts. John Doe 19 was murdered and his body was found a few blocks from his home.

387.    Jane Doe 16 is filing on behalf of her partner, John Doe 19.

388.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 19 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 17/John Doe 20*

389.    John Doe 20, was murdered by the AUC in March 1997, in Turbo. Jane Doe 17 is recognized as a victim in the Justice and Peace proceedings, because her son was murdered by the AUC.

390.    Jane Doe 17 is filing on behalf of her son, John Doe 20.

391.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 20 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 18/John Doe 21*

392.    John Doe 21, was murdered by the AUC in March 1997 in Turbo.  The murder has been recognized in the Justice and Peace process.

393.    Jane Doe 18 is filing on behalf of her husband, John Doe 21.

394.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 21 through their support of the AUC in Urabá, which at the time of the events was in control of the region.


*Jane Doe 19/John Doe 22*

395.    John Doe 22, was killed by the AUC in March 1997 in Chigorodo. John Doe 22 was a banana worker and was killed by paramilitaries in the presence of his partner.

396.    Jane Doe 19 is filing this action on behalf of her son, John Doe 22.

397.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 22 through their support of the AUC in Urabá, which at the time of the events was in control of the region.


*Jane Doe 119/John Doe 24*

398.    John Doe 24, was murdered by the AUC in front of their house in February 1997. The AUC forced Jane Doe 119 to call her son and have him return to the house, and then they killed him.

399.    Jane Doe 119 is filing this action on behalf of her son, John Doe 24.

400.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 24 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 20/John Doe 25*

401.     John Doe 25 was murdered by the AUC in January 1997. John Doe 25 was a banana worker on a farm in Apartado. The AUC rounded up several workers at a restaurant on the farm, and killed John Doe 25 and several others.

402.     Jane Doe 20 is filing this action on behalf of her partner, John Doe 25.

403.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 25 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

404.     On information and belief, Chiquita and the Defendants benefited from the death of John Doe 25 by quelling dissent amongst banana workers that threatened the stability and profitability of Chiquita's operations.


*Jane Doe 21/Jane Doe 22/John Doe 26*

405.     Jane Doe 22 and John Doe 26, were murdered by the AUC in January 1997 in Turbo. Jane Doe 21, Jane Doe 22 and John Doe 26 were traveling by taxi from Apartado to Turbo – to collect a payment on the sale of a farm – when they were stopped by members of the AUC. Jane Doe 21 watched as the paramilitaries killed her parents.

406.     Jane Doe 21 files this action on her own behalf, and on behalf of her parents, Jane Doe 22 and John Doe 26.

407.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the deaths of Jane Doe 22 and John Doe 26 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

66

*Jane Doe 23/John Doe 27/John Doe 28*

429.   John Doe 27 and John Doe 28, were killed by the AUC in January 1997 in Mutata. Four members of the AUC entered a cantina, shot and killed John Doe 27 and John Doe 28.

408.   Jane Doe 23 brings this action on behalf of her son, John Doe 27, and her husband, John Doe 28.

409.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the deaths of John Doe 27 and John Doe 28 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 24/John Doe 29/Jane Doe 25/John Doe 30*

410.   John Doe 29 and John Doe 30, were murdered by the AUC in July 1996. John Doe 29 and John Doe 30 were leaders in a local communal action board in Chigorodo and were attending a meeting of that board. Members of the AUC arrived at the meeting and killed John Doe 29 and John Doe 30.

411.   Jane Doe 24 brings this action on behalf of her partner, John Doe 29.

412.   Jane Doe 25 brings this action on behalf of her partner, John Doe 30.

413.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the deaths of John Doe 29 and John Doe 30 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

414.   On information and belief, Chiquita benefited from the deaths of John Doe 29 and 30 by removing community activists who threatened the stability of Chiquita's operations.

*Jane Doe 26/John Doe 31*

415.     Jane Doe 26's husband, John Doe 31, was murdered by the AUC in 1996. In June 1997, Jane Doe 26 was approached and threatened by several members of the AUC in Apartado. The members of the AUC told her that she had twenty-four hours to leave the region.

416.     Jane Doe 26 brings this action on her own behalf, and on behalf of her husband, John Doe 31.

417.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 31 and the assault, forced eviction and relocation of Jane Doe 26 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Does 23 and 105/Jane Does 27, 30, 31, 99, 100, 121, and 122*

418.     In July 1997, the AUC visited a property in Apartado, owned by John Doe 105 and Jane Doe 31, who were married. The AUC were looking for John Doe 105, who was not there at the time.

419.     They disappeared Jane Doe 31 and her daughter, Jane Doe 100. Later that day, the AUC found and murdered John Doe 105.

420.     Also that day, the AUC threatened Jane Doe 27, Jane Doe 121, and John Doe 23 – the remaining children of John Doe 105 and Jane Doe 31 – and Jane Doe 122 – the granddaughter of John Doe 105 and Jane Doe 31. All were told to leave Uraba, and they all fled.

421.     Jane Doe 27 was attacked by the AUC again in 1999, after she had already relocated to Irra, forcing her to flee and relocate once again.

422.     Jane Doe 27 is filing on her own behalf and for her father, John Doe 105.

423.     Jane Doe 30 is filing on her own behalf and for her mother, Jane Doe 31.

424.     Jane Doe 99 is filing on behalf of her mother, Jane Doe 100.

425.     Jane Doe 121 is filing on her own behalf.

426.     Jane Doe 122 is filing on her own behalf.

427.     John Doe 23 is filing on his own behalf.

428.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the threats, forced eviction/relocation and displacement of Jane Doe 27, Jane Doe 30, Jane Doe 31 and John Doe 36 by and through their support of the AUC in Urabá, which at the time of the events was in control of the region. On information and belief, Chiquita and the Defendants also caused, intended, conspired in, and/or aided and abetted the deaths and disappearances of John Doe 105, Jane Doe 31, and John Doe 31 as a result of that same support.


*John Doe 32*

429.     John Doe 32 was threatened and forced to relocate because of an attack by the AUC in April 1996. John Doe 32 was a member of a political party, the Union Patriotica. In April, the AUC killed ten members of the party who were gathered at a billiards hall. John Doe 32 was present for the killing but managed to escape. The next day, he was forced to flee Uraba.

430.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the assault, battery, forced eviction/relocation of John Doe 32 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

431.     On information and belief, Chiquita benefited from the forced displacement of John Doe 32 because there was one less political activists who threatened the stability of Chiquita's operations in the region.

*John Doe 33*

432.    John Doe 33 was threatened and assaulted by the AUC in December 1997 in Turbo. The AUC carried out an attack, and killed several people, which John Doe 33 witnessed. The AUC threatened the surviving witnesses and John Doe 33 was forced to relocate.

433.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the assault, battery, forced eviction/relocation of John Doe 33 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 28/John Doe 34*

434.    John Doe 34, was killed by the AUC in December 2002 in the Carepa municipality. This murder has been recognized in the Justice and Peace proceedings.

435.    Jane Doe 28 brings this action on behalf of her brother, John Doe 34.

436.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 34 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Doe 35*

437.    John Doe 35 was a banana worker working in Apartadó. In December 1998, John Doe 35 was kidnapped and tortured by members of the AUC. He was also threatened upon his release.

438.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the assault, torture and kidnapping of John Doe 35 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 29*

439.    Jane Doe 29 was threatened, beaten and raped by members of the AUC in December 1996. She was forced to relocate to Medellin, but also received threats from the AUC there, and was forced to relocate again in 2002, this time to Bogota.

440.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the assault, kidnapping, rape and forced eviction/relocation of Jane Doe 29 by and through their support of the AUC in Urabá, which at the time of the events was in control of the region.


*John Doe 36*

441.    John Doe 36 was threatened, pursued and had his farms destroyed by the AUC in 1996. John Doe 36 was a member of the Communist party, and an advisor to a labor union, he also owned a small banana farm. In April 1996, the AUC invaded his farm, destroyed his crops, and forced John Doe 36 to abandon his property and flee into the jungle.

442.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the threats, trespass, conversion, property destruction and forced eviction/relocation of John Doe 36 by and through their support of the AUC in Urabá, which at the time of the events was in control of the region.

443.    On information and belief, Chiquita and the Defendants benefited from the destruction of property and other torts committed against John Doe 36 because those torts removed a political activist who threatened the stability of Chiquita's operations in the region.


*John Doe 37*

444.    The Colombian army alleged that John Doe 37's father was a guerilla. In September 1997, John Doe 37 was on a bus stopped by the AUC. The members of the AUC had a list of names, they called John Doe 37, and removed him from the bus. He was told to and did leave Uraba after the threat.

445.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the threats and forced eviction/relocation of John Doe 37 by and through their support of the AUC in Urabá, which at the time of the events was in control of the region.


*John Doe 40*

446.    John Doe 40 was a banana worker on a farm in Turbo; he was also a member of the Communist and Patriotica Union parties. In July 1997, the AUC threatened him and was forced to flee Uraba.

447.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the threats, and forced eviction/relocation of John Doe 40 by and through their support of the AUC in Urabá, which at the time of the events was in control of the region.

448.    On information and belief, Chiquita and the Defendants benefited from displacement of John Doe 40 because those torts removed a political activist who threatened the stability of Chiquita's operations in the region.


*John Doe 42*

449.    In September 1997, John Doe 42 worked at a farm in Apartado. In September 1997, he

was kidnapped by paramilitaries and detained in a cell for four days. During that time, they battered and tortured him, until he promised to leave Uraba.

450.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the threats, battery, unlawful imprisonment, torture and other injuries of John Doe 42 by and through their support of the AUC in Urabá, which at the time of the events was in control of the region.


*Jane Doe 32/John Does 39, 41 and 46*

451.    In June 1997, several banana workers, and other individuals were rounded up by the AUC near the central dam in Apartado. They were taken to a nearby school where they were beaten, shot, threatened, and/or told to leave Uraba.

452.    John Doe 39 was a banana worker and part of a union, he was also a member of several political parties, including the Communist Party and the Union Patriotica. He was a victim of this June 1997 incident. Members of the AUC threatened him and told him that he had twenty-four hours to leave. He fled and was displaced. He brings this claim on his own behalf.

453.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the threats, and forced eviction/relocation of John Doe 39 by and through their support of the AUC in Urabá, which at the time of the events was in control of the region.

454.    John Doe 41 was a union leader in Apartado. In this June 1997 incident, he was detained by several members of the AUC, who beat and shot him. He is now disabled. He brings these claims on his own behalf.

455.    On information and belief, Chiquita and the Defendants caused, intended, conspired in,

and/or aided and abetted the threats, assault, battery, conversion, trespass and other injuries of John Doe 41 by and through their support of the AUC in Urabá, which at the time of the events was in control of the region.

456.     In John Doe 46 was also detained by the AUC in this incident, threatened and told to leave the area. He brings these claims on his own behalf.

457.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the displacement and other injuries of John Doe 46 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

458.     Jane Doe 32 was also detained by paramilitaries in Apartado and told to leave the region in twenty-hour hours. He brings these claims on his own behalf.

459.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the assault, displacement and other injuries of Jane Doe 32 by and through their support of the AUC in Urabá, which at the time of the events was in control of the region.


*Jane Doe 120/John Doe 44*

460.     In or around September 1998, Jane Doe 120's son, John Doe 44, was murdered by the AUC in Apartado. This murder has been recognized in the Justice and Peace proceedings.

461.     Jane Doe 120 brings this action on behalf of her son, John Doe 44.

462.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 44 through their support of the AUC in Urabá, which at the time of the events was in control of the region.


*John Doe 45*

463.     In August 1997, John Doe 45 was shot by the AUC. He survived the shooting, but was forced to flee his home and property.

464.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the shooting, displacement and other injuries of John Doe 45 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Does 47-50/Jane Does 33-34*

465.     John Doe 47 was a worker on a banana farm. And, in January 2002, John Doe 47 was murdered by the AUC. On that day, John Doe 47 was the house of Jane Doe 33, his mother, when the AUC called for him. They took him, along with several others, and he was murdered.

466.     John Doe 47 is survived by his mother, Jane Doe 33, his sister, Jane Doe 34, and his brothers, John Does 48, 49 and 50.

467.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided in the murder of John Doe 47 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 35/John Doe 51*

468.     John Doe 51 was murdered by the AUC in March 2001. This murder has been recognized in the Justice and Peace proceedings.

469.     Jane Doe 35 brings this action on behalf of her partner, John Doe 51.

470.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 51 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 36/John Doe 52*

471.    John Doe 52, the son and relation of Jane Doe 36, was murdered by the AUC in May 2002. This murders has been recognized in the Justice and Peace proceedings.

472.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 52 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Does 53-54/Jane Does 37-39*

473.    John Doe 53 was murdered by the AUC in March 2003 in Apartado. This murder has been recognized in the Justice and Peace proceedings.

474.    He is survived by Jane Doe 37, his mother, Jane Does 38 and 39, his sisters, and John Doe 54, his brother.

475.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 53 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Does 55-58/Jane Does 40-44*

476.    John Doe 55 worked as a banana farmer in Turbo. In August 1998, a member of the AUC, known as "Ponchi," came to his house. He took John Doe 55 from his home, shot and killed him.

477.    John Doe 55 is survived by his mother, Jane Doe 40, his son, John Doe 56, his daughter, Jane Doe 41, his brothers, John Does 57 and 58, and his sisters, Jane Does 41, 42, 43 and 44.

478.    On information and belief, Chiquita and the Defendants caused, intended, conspired in,

and/or aided the murder of John Doe 55 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Doe 59/Jane Doe 45/John Doe 60*

479.    John Doe 59 was a farm worker in Turbo. In or around February 1997, he was murdered by the AUC. This murder has been recognized in the Justice and Peace proceedings.

480.    John Doe 59 is survived by his wife, Jane Doe 45, and his son, John Doe 60.

481.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 59 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Doe 61/John Doe 62/John Doe 63/Jane Doe 46/Jane Doe 47*

482.    John Doe 61 was driving a bus in March 1997, which was stopped by the AUC. The AUC ordered all of the passengers off the bus, then murdered John Doe 61. This death has been recognized in the Justice and Peace proceedings.

483.    John Doe 61 is survived by his partner, Jane Doe 46, his sons, John Does 62 and 63, and his daughter, Jane Doe 47.

484.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 61 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Doe 64/John Doe 65/Jane Doe 48*

485.    In December 1998, John Doe 64 was at his home when Colombian soldiers came to his

door. Later that day, he was detained by members of the AUC, who told his wife that he was being held; he was disappeared by the AUC. His death has been recognized in the Justice and Peace proceedings.

486.     John Doe 64 is survived by his children, John Doe 65 and Jane Doe 48.

487.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the disappearance of John Doe 64 through their support of the AUC in Urabá, which at the time of the events was in control of the region.


*John Doe 67/John Doe 66/Jane Does 49-54*

488.     In September 2000, John Doe 67 was murder by members of the AUC in his family home. He is survived by his parents, John Doe 66 and Jane Doe 49, and his sisters, Jane Does 50, 51, 52, 53, and 54.

489.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 67 through their support of the AUC in Urabá, which at the time of the events was in control of the region.


*John Doe 68/Jane Doe 55*

490.     John Doe 68 was a farmworker. He was taken from his home in August 2000 by members of the AUC and murdered. This death has been recognized in the Justice and Peace proceedings.

491.     Jane Doe 55 brings this action on behalf of her partner, John Doe 68.

492.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 68 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Does 69 - 70/Jane Does 56-58*

493.    Jane Doe 56's son, John Doe 69, was kidnapped and murdered by the AUC in March 2001. This death is recognized in the Justice and Peace proceedings.

494.    He is survived by his mother, Jane Doe 56, his sisters, Jane Does 57 and 58, and his brother, John Doe 70.

495.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 69 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Does 71-72/Jane Does 59-60*

496.    Jane Doe 59's husband, John Doe 72, was a truck driver that was murdered by the AUC in January 2001. This death was recognized in the Justice and Peace proceedings.

497.    He is survived by his wife, Jane Doe 59, and his children, John Doe 71 and Jane Doe 60.

498.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 72 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Does 73-76/Jane Doe 61*

499.    John Doe 76 was a banana farmer that owned his own parcel of land. He and a companion, John Doe 78, were murdered by the AUC in March 1996. This death was recognized in the Justice and Peace proceedings.

500.    He is survived by his son, John Doe 75, his brothers, John Does 73 and 74, and his sister

Jane Doe 61.

501.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 76 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Does 43, 77 and 78/Jane Does 62-64*

502.     John Doe 78 was a worker on a banana farm. He and a companion, John Doe 76, were murdered by the AUC in March 1996. These deaths were recognized in the Justice and Peace proceedings.

503.     He is survived by his mother, Jane Doe 62, his sisters, Jane Does 63 and 64, and his brothers, John Does 43 and 77.

504.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 78 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Doe 79/Jane Does 65-67*

505.     John Doe 79 was disappeared by the AUC in December 2000, and was also, in or around that time, murdered by the AUC. His death was recognized in the Justice and Peace proceedings.

506.     He is survived by his mother, Jane Doe 65, and his sisters, Jane Does 66 and 67.

507.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the disappearance and murder of John Doe 79 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Does 68-70*

508.   Jane Doe 70 was an agricultural worker, and a member of the Sintrainago union. She was also a member of the Union Patriotica party. In June 1996, she was murdered by the AUC. This death was recognized in the Justice and Peace proceedings.

509.   This action is brought on behalf of Jane Doe 70, by her daughters, Jane Does 68 and 69.

510.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, benefited from and/or aided the murder of Jane Doe 70 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Does 80-81/Jane Does 71-74*

511.   John Doe 81 was murdered in August 2003 by a member of the AUC.

512.   He is survived by his partner, Jane Doe 71, his daughters, Jane Doe 72-74, and his son, John Doe 80.

513.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 81 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Doe 82/Jane Does 75-78*

514.   Jane Doe 75's son, John Doe 82, was murdered at work, and in front of his colleagues, by the AUC in November 2009.

515.   He is survived by his mother, Jane Doe 75, and his sisters, Jane Does 76-78.

516.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 82 through their support of the AUC in Urabá, which at the

time of the events was in control of the region.

*John Doe 83/Jane Does 79-85*

517.    John Doe 83 was the president of a local communal action board. The board had a meeting in September 2001, and several members of the AUC interrupted. John Doe 83 was taken by the paramilitaries from the meeting and murdered.

518.    He is survived by his mother, Jane Doe 79, his sisters, Jane Does 80 and 81, and his daughters Jane Does 82, 83, 84 and 85.

519.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the kidnaping and murder of John Doe 83 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

520.    On information and belief, Chiquita and the Defendants benefited from the death of John Doe 83 by removing a community leader whose actions threatened the stability and profitability of Chiquita's operations.

*John Doe 84-85/Jane Does 86-88*

521.    John Doe 85 worked at a fruit company in Apartado. He was murdered by the AUC, in front of Jane Doe 86, in February 2001. His death is recognized in the Justice and Peace proceedings.

522.    John Doe 85 is survived by his partner, Jane Doe 86, his son, John Doe 84, and his daughters, Jane Doe 87 and Jane Doe 88.

523.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the kidnaping and murder of John Doe 85 through their support of the AUC in

Urabá, which at the time of the events was in control of the region.

*John Does 86-87/Jane Doe 89*

524.    John Doe 87 was an active member of a union, SINTRAFOAN. In March 1996, he was in his home, when members of the AUC came and murdered him there.

525.    He is survived by his partner, Jane Doe 89, and his son, John Doe 86.

526.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the kidnaping and murder of John Doe 87 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

527.    On information and belief, Chiquita and the Defendants benefited from the death of John Doe 87 by removing a labor organizer whose actions threatened the stability and profitability of Chiquita's operations.

*John Does 88-91/Jane Does 90-92*

528.    John Doe 91 was a farm laborer in Chigorodo. In April 1996, he was taken from his home by members of the AUC. He was murdered by the AUC and his body was found by his family on the side of the road the next day.

529.    John Doe 91 is survived by his mother, Jane Doe 90, his father, John Doe 88, his sisters, Jane Doe 91 and 92, and his brothers John Does 89 and 90.

530.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the kidnaping and murder of John Doe 91 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Doe 92/Jane Doe 93*

531.    Jane Doe 93's father, John Doe 92, was murdered by an AUC commander in March 1996, in connection with a land dispute.

532.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the kidnaping and murder of John Doe 92 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Doe 93/Jane Does 94-96*

533.    Jane Doe 96 owned a butcher shop and refused to pay a tax to the AUC. In June 1995, members of the AUC showed up on Jane Doe 96's home, tied her up, and threatened to rape one of her daughters. Jane Doe 96 tried to escape with her daughter but was shot by an AUC member and died.

534.    This action is brought on Jane Doe 96's behalf by her children, John Doe 93 and Jane Does 94 and 95.

535.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the kidnaping and murder of Jane Doe 96 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Doe 94-95/Jane Doe 97*

536.    John Doe 95 was a farmer and a member of Union Patriotica party in Turbo. In January 1996, John Doe 95 was kidnapped by the AUC on the way to his farm, he was tortured and eventually murdered. This action has been recognized in the Justice and Peace proceedings.

537.    This action is brought on behalf of John Doe 95 by his children, John Doe 94 and Jane

Doe 97.

538.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the kidnaping, torture and murder of John Doe 95 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

539.     On information and belief, Chiquita and the Defendants benefited from the death of John Doe 95 by removing a political activist whose actions threatened the stability and profitability of Chiquita's operations.

*John Doe 96-98/Jane Doe 98*

540.     John Doe 98 was threatened and killed by the AUC on the orders of a paramilitary commander known as El Aleman. This death has been recognized in the Justice and Peace proceedings.

541.     He is survived by his partner, Jane Doe 98, and his step-sons, John Does 96 and 97.

542.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 98 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Does 102-103/Jane Does 103-104*

543.     John Doe 103 worked on a farm owned by his father in Apartado. In September 2000, several members of the AUC showed up at John Doe 103's home, inquiring about his whereabouts. He was later found, murdered and his body was left on a banana farm.

544.     He is survived by his partner, Jane Doe 103, and his children, John Doe 102 and Jane Doe 104.

545.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, benefited from, and/or aided the murder of John Doe 103 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Doe 104/Jane Does 105-106*

546.    In September 2002, John Doe 104 was abducted from his home in Turbo – in the middle of the night and in the presence of his partner, Jane Doe 105 – and later murdered by the AUC.

547.    He is survived by his partner, Jane Doe 105, and his daughter, Jane Doe 106.

548.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of 104 through their support of the AUC in Urabá, which at the time the events was in control of the region.

*John Doe 105-107/Jane Does 107-108*

549.    John Doe 107 was a laborer on banana farms in Turbo. In or around March 2003, John Doe 107 was murdered by the AUC. This death has been recognized in the Justice and Peace proceedings.

550.    He is survived by his son, John Doe 105, his brother John Doe 106, and his sisters, Jane Does 107 and 108.

551.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 107 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Does 108-109/Jane Does 109-112*

552.     John Doe 109 was a laborer on several farms in Carepa. In April 1997, several members of the AUC abducted him from his home and murdered. His body was found in a dumpster on a nearby farm. This death has been recognized in the Justice and Peace proceedings.

553.     He is survived by his partner, Jane Doe 109, his daughters Jane Does 110-112, and his son, John Doe 108.

554.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 109 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Does 110-113/Jane Does 113-118*

555.     John Doe 113 lived with his family in Apartado. In January 2001, several members of the AUC broke into his home, and killed him as he tried to escape.

556.     John Doe 113 is survived by his mother, Jane Doe 113, his partner, Jane Doe 118, his son, John Doe 112, his daughters, Jane Does 116 and 117, his brothers, John Does 110 and 111, his sisters, Jane Does 114 and 115.

557.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 113 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Does 114 and 115*

558.     In or around December 1996, John Doe 115 was murdered by the AUC in Turbo. This death has been recognized in the Justice and Peace proceedings.

559.     John Doe 114 brings this action on behalf of his brother, John Doe 115.

560.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 115 through their support of the AUC in Urabá, which at the time of the events was in control of the region.


*John Does 116-120/Jane Does 119-120, 123-124 and 141-142*

561.    John Doe 120 was murdered by the AUC in or around June 2000. This death has been recognized in the Justice and Peace proceedings.

562.    He is survived by his mother, Jane Doe 119, his sisters, Jane Does 120, 123, 141 and 142, his brothers, John Does 116 and 117, and his children John Does 118 and 119 and Jane Doe 124.

563.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the attempted kidnapping and murder of John Doe 120 through their support of the AUC in Urabá, which at the time of the events was in control of the region.


*John Doe 121/Jane Doe 125*

564.    In or around April 2003, John Doe 121 was murdered by the AUC in Mutata. John Doe 121 was an agricultural worker. Two men who were part of the Elmer Cardenas bloc of the AUC, including "El Mono," murdered John Doe 121 when he was on his way to work at a farm. This death has been recognized in the Justice and Peace proceedings.

565.    Jane Doe 125 brings this action on behalf of her partner, John Doe 121.

566.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 121 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Does 122 – 125/Jane Does 126-135*

567.     John Doe 125, was murdered in or around October 1998 by the AUC. This death has been recognized in the Justice and Peace proceedings.

568.     He is survived by his partner, Jane Doe 126, his daughter, Jane Doe 127, his mother, Jane Doe 128, his sisters, Jane Does 129-135, and his brothers John Does 123, 124 and 125.

569.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 125 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Does 126-130/Jane Does 136-138*

570.     John Doe 131 was a laborer at a farm. He was murdered by the AUC in or around March 2003 in Turbo. This death has been recognized in the Justice and Peace proceedings.

571.     He is survived by his partner, Jane Doe 136, his daughters, Jane Does 137 and 138, and his sons John Does 126-130.

572.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the kidnapping and murder of John Doe 131 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Does 132 and 133/Jane Does 139 and 140*

573.     John Doe 133, was murdered by the AUC in or around January 1999 in Turbo. This death has been recognized in the Justice and Peace proceedings.

574.     He is survived by his partner, Jane Doe 139, his daughter, Jane Doe 130, and his son, John Doe 132.

575.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 133 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Does 134-137/ Jane Does 143 and 144*

576.     John Doe 137, was murdered by the AUC on or around October 19, 1996 in Apartado. This death has been recognized in the Justice and Peace proceedings.

577.     He is survived by his partner Jane Doe 143, his daughter Jane Doe 144, and his sons John Does 134, 135 and 136.

578.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 137 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Does 38, 99-101/ Jane Does 101 and 102*

579.     John Doe 38, was murdered by the AUC on or around November 25, 1996 in Apartado. This death has been recognized in the Justice and Peace proceedings.

580.     He is survived by his wife Jane Doe 101, his daughter Jane Doe 102, and his sons John Does 99, 100 and 101.

581.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 38 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Does 138 and 139/ Jane Does 145 and 146*

582.     John Doe 138, was murdered by the AUC on or around June 6, 1999 in Chigorodo. This death has been recognized in the Justice and Peace proceedings.

583.     He is survived by his mother Jane Doe 145, his father John Doe 139 and his sister Jane Doe 146.

584.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 138 through their support of the AUC in Urabá, which at the time of the events was in control of the region.


*John Doe 140/Jane Doe 147*

585.     John Doe 140 was a banana worker in Apartado. He was murdered by the AUC in May 2004.

586.     Jane Doe 147 brings this action on behalf of her husband, John Doe 140.

587.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 140 through their support of the AUC in Urabá, which at the time of the events was in control of the region.


*John Doe 141/Jane Doe 148*

588.     John Doe 141 was a banana worker, he was murdered by the AUC in April 2004 in Apartado.

589.     Jane Doe 148 brings this action on behalf of her husband, John Doe 141.

590.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 141 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Doe 142/Jane Doe 149*

591.    John Doe 142 worked as a banana farmer in Turbo. In August 2003, he was detained by members of the AUC and brought to another farm, where he was murdered. His stepfather and uncle had been murdered years before by the AUC.

592.    Jane Doe 149 brings this action on behalf of her son, John Doe 142.

593.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 142 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Doe 143/Jane Doe 150*

594.    John Doe 143 worked on a farm worker in Turbo, which was owned by his father. He was murdered by the AUC in May 2003. On information and belief, the order was given by a paramilitary known as "El Viejo".

595.    Jane Doe 150 brings this action on behalf of her brother, John Doe 143.

596.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 143 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Doe 199/Jane Doe 151*

597.    John Doe 199 was a banana worker in Apartado. He was murdered by the AUC in November 2001. His sons were also murdered by the AUC.

598.    Jane Doe 151 brings this action on behalf of her husband, John Doe 199.

599.    On information and belief, Chiquita and the Defendants caused, intended, conspired in,

92

and/or aided the murder of John Doe 199 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Doe 144/Jane Doe 152*

600.    John Doe 144 was a teacher in Apartado. He was murdered by the UAUC in November 2001.

601.    Jane Doe 152 brings this action on behalf of her partner, John Doe 144.

602.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 144 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 153/Jane Doe 154*

603.    Jane Doe 153 worked as part of an agricultural co-op. She was murdered by the AUC in June 2001.

604.    Jane Doe 154 brings this action on behalf of her daughter, Jane Doe 153.

605.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of Jane Doe Doe 153 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Doe 145/Jane Doe 155*

606.    Jane Doe 155 was murdered by the AUC in April 2001 in Apartado.

607.    John Doe 145 brings this action on behalf of his mother, Jane Doe 155.

608.    On information and belief, Chiquita and the Defendants caused, intended, conspired in,

and/or aided the murder of Jane Doe 155 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Doe 146/Jane Doe 156*

609.   John Doe 146 worked on a Banadex farm. He was murdered by the AUC in February 2003.

610.   Jane Doe 156 brings this action on behalf of her son, John Doe 146.

611.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, benefited from, and/or aided the murder of John Doe 146 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Doe 147/Jane Doe 157*

612.   John Doe 147 was murdered by the AUC in February 2001. He was confronted near his home by a paramilitary, known as "Jorge", and killed.

613.   Jane Doe 157 brings this action on behalf of her son, John Doe 147.

614.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 147 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Doe 148/Jane Doe 158*

615.   John Doe 148 was a banana worker in Apartadó. He was killed by the AUC in February 2001.

616.   Jane Doe 158 brings this action on behalf of her son, John Doe 148.

617.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 148 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Doe 149/Jane Doe 159*

618.     John Doe 149 was a banana worker in Apartado. He was murdered by the AUC in December 2000.

619.     Jane Doe 159 brings this action on behalf of her partner, John Doe 149.

620.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 149 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Doe 150/Jane Doe 160*

621.     John Doe 150 was a banana worker in Apartado. He was killed by the AUC in December 2000. On information and belief, the paramilitary responsible for the killing was known as "Cepillo".

622.     Jane Doe 160 brings this action on behalf of her partner, John Doe 150.

623.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 150 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Doe 151/Jane Doe 161*

624.     John Doe 151 was a banana worker. He was murdered by the AUC, in his home, in

December 2000.

625. Jane Doe 161 brings this action on behalf of her brother, John Doe 151.

626. On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 151 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Doe 152/Jane Doe 162*

627. John Doe 152 was a banana truck driver. He was murdered by the AUC.

628. Jane Doe 162 brings this action on behalf of her partner, John Doe 152.

629. On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 152 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Doe 153/Jane Doe 163*

630. John Doe 153 owned a farm. He was driving in Apartado in October 2000, when he was detained by members of the AUC. He was kidnapped and then murdered. His father had also been murdered by the AUC years earlier.

631. Jane Doe 163 brings this action on behalf of her brother, John Doe 153.

632. On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 153 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Doe 154/Jane Doe 164*

633.     John Doe 154 was a banana worker. He lived in a town – where his brother was murdered – but was forced to flee by the AUC. But he was unable to escape the AUC, and was murdered by them in September 2000.

634.     Jane Doe 164 brings this action on behalf of her son, John Doe 154.

635.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 154 through their support of the AUC in Urabá, which at the time of the events was in control of the region.


*John Doe 155/Jane Doe 165*

636.     John Doe 155 was murdered by the AUC on a banana farm in September 2000.

637.     Jane Doe 165 brings this action on behalf of her partner, John Doe 155.

638.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 155 through their support of the AUC in Urabá, which at the time of the events was in control of the region.


*John Doe 156/Jane Doe 166*

639.     John Doe 156 was a banana worker. He was murdered by the AUC in July 2000.

640.     Jane Doe 166 brings this action on behalf of her partner, John Doe 156.

641.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 156 through their support of the AUC in Urabá, which at the time of the events was in control of the region.


*John Doe 157/Jane Doe 167*

642.    John Doe 157 was a banana worker in Apartadó. He was disappeared and murder by the AUC in or around March 2000.

643.    Jane Doe 167 brings this action on behalf of her partner, John Doe 157.

644.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 157 through their support of the AUC in Urabá, which at the time of the events was in control of the region.


*John Doe 158/Jane Doe 168*

645.    John Doe 158 was a banana worker. He was murdered by the AUC in April 1998 on or near Zunga, a loading dock for bananas.

646.    Jane Doe 168 brings this action on behalf of her brother, John Doe 158.

647.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 158 through their support of the AUC in Urabá, which at the time of the events was in control of the region.


*Jane Doe 169/Jane Doe 170*

648.    Jane Doe 169 was a banana worker. She was forced to leave her home, with her partner and children. But, this did not save her. She was murdered by the AUC in or around September 1999. Her partner was also killed by the AUC.

649.    Jane Doe 170 brings this action on behalf of her sister, Jane Doe 169.

650.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of Jane Doe 169 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Doe 159/Jane Doe 171*

651.    John Doe 159 was the owner of a banana farm. He was murdered by the AUC in September 1999. His family was forcibly displaced.

652.    Jane Doe 171 brings this action on behalf of her brother, John Doe 159.

653.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, benefited from and/or aided the murder of John Doe 143 through their support of the AUC in Urabá, which at the time of the events was in control of the region.


*John Doe 160/Jane Doe 172*

654.    John Doe 160 was a banana worker. He was told by the owners of the farm that he had been replaced by another worker; but, John Doe 160 refused to leave until he received the severance he was entitled under the labor laws. He was murdered by the AUC in August 1999.

655.    Jane Doe 172 brings this action on behalf of her partner, John Doe 160.

656.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, benefited from, and/or aided the murder of John Doe 160 through their support of the AUC in Urabá, which at the time of the events was in control of the region.


*John Doe 161/John Doe 162*

657.    John Doe 162's son, John Doe 161 was in charge of the drains on a banana farm. He was killed in July 1999, in Apartadó, by the AUC paramilitaries. John Doe 162 brings this action on behalf of John Doe 161.

658.    On information and belief, Chiquita and the Defendants caused, intended, conspired in,

and/or aided in the murder of John Doe 161 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane 173/John Doe 163*

659.    Jane Doe 173's partner John Doe 163 was a banana worker on in Apartadó. In July 1999, he was working at the farm, and two AUC paramilitaries came on motorcycles and killed him.

660.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided in the murder of John Doe 163 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 174/John Doe 164/John Doe 210*

661.    Jane Doe 174's father, John Doe 164 worked as a driver (*cochero*) and was killed in July 1999 by the AUC paramilitaries who arrived at his house in Apartadó and shot him with a firearm. Two of his children had been killed years before.

662.    Jane Doe 174's son, John Doe 210 was killed by the AUC in January 1999. He was first kidnapped at night from his house in Apartadó and then killed by the AUC paramilitaries.

663.    Jane Doe 174 brings this action individually and on behalf of her father, John Doe 164, and her son, John Doe 210.

664.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided in the murder of John Doe 164 and John Doe 210 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 175/John Doe 165*

665.    Jane Doe 175's partner John Doe 165 was a banana worker and labor union leader. In July 1999, when he was at home in Chigorodó, seven men who identified themselves as AUC paramilitaries killed him with a knife.

666.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 165 through its support of the AUC in Urabá. On information and belief, Chiquita and the Defendants benefited from the death of John Doe 165 by removing a labor activist who threatened the stability and profitability of Chiquita's operations.

*Jane Doe 176/John Doe 166*

667.    Jane Doe 176's husband John Doe 166 was a member of the executive committee of the administration council of the banana farm and cooperative. In May 1999, he was at a soccer game, at the end of the match two AUC paramilitaries came asking for him. They told him he had been criticizing the AUC and took him away and killed him.

668.    Jane Doe 176 brings this action individually and on behalf of her husband, John Doe 166.

669.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 166 through its support of the AUC in Urabá.

670.    On information and belief, Chiquita and the Defendants benefited from the death of John Doe 166 by removing a labor activist who threatened the stability and profitability of Chiquita's operations.

*Jane Doe 177/ John Doe 167*

671.    Jane Doe 177's son John 167 was killed by the AUC paramilitaries in April 1999 in

Apartadó.

672.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 176 through its support of the AUC in Urabá.

*Jane Doe 180/John Doe 168*

673.    Jane Doe 180's brother, John Doe 168 was a small farm owner. He was accused of being a guerilla collaborator and killed by the AUC in October 1998.

674.    Jane Doe 180 is filing this action on behalf of John Doe 168.

675.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the deaths of John Doe 168 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 181/John Doe 169*

676.    Jane Doe 181's partner John Doe 169 was a banana worker in a farm in Carepa.

677.    In September 1998, he was working on the farm when four men on two motorcycles arrived asking for him.  In the packing building they told him to go to the office where the AUC paramilitaries were waiting for him; they tied him up and took him away. They killed him on exiting the farm.

678.    Jane Doe 181 is filing on behalf of John Doe 169.

679.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the deaths of John Doe 168 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 182/John Doe 170*

680.  Jane Doe 182's partner, John Doe 170 was a banana worker in Apartadó. In July 1998, when he was on the farm, armed men on motorcycles arrived and identified themselves as AUC paramilitaries.

681.  They were looking for three of the workers but they only detained and killed John Doe 170 because the other two fled. Jane Doe 182 brings this action on behalf of John Doe 170.

682.  On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the deaths of John Doe 170 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 183/John Doe 171*

683.  Jane Doe 183's brother John Doe 171 was a banana farmer. He was killed Carepa by members of the AUC paramilitaries.

684.  On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the deaths of John Doe 171 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 184/John Doe 172*

685.  Jane Doe 184's son John Doe 172 was a banana worker on the Epoban farm where he ran the producers' cooperative.

686.  In May 1998, he was tortured and killed in his home in Turbo by three AUC paramilitaries.

687.  They tied him up and stabbed a screwdriver into his head before they shot him.

688.    Jane Doe 184 brings this action on behalf of John Doe 172.

689.    On information and belief, Chiquita and the Defendants caused, intended, conspired in,

benefited from and/or aided and abetted the deaths of John Doe 172 through their support of the

AUC in Urabá, which at the time of the events was in control of the region.


*Jane Doe 185/John Doe 173*

690.    Jane Doe 185's partner John Doe 173 was a banana worker in Apartadó. He was detained

by the AUC paramilitaries and then tortured and killed.

691.    Jane Doe 185 brings this action on behalf of John Doe 173.

692.    On information and belief, Chiquita and the Defendants caused, intended, conspired in,

and/or aided and abetted the deaths of John Doe 173 through their support of the AUC in Urabá,

which at the time of the events was in control of the region.


*Jane Doe 186/John Doe 174*

693.    Jane Doe 186's husband John Doe 174 a leader of a communal action board in Apartadó.

694.    In February 1998, he was in his house when the AUC paramilitaries came and took him

away on a motorcycle; his whereabouts are unknown to this day.

695.    On information and belief, Chiquita and the Defendants caused, intended, conspired in,

and/or aided and abetted the death of John Doe 174 through their support of the AUC in Urabá,

which at the time of the events was in control of the region.

696.    On information and belief, Chiquita and the Defendants benefited from the death of John

Doe 174 by removing a community leader whose actions threatened the stability and profitability

of Chiquita's operations.

*Jane Doe 187/John Doe 175*

697.    Jane Doe 187's brother John Doe 175 was detained by the AUC on his way to El Casco

(Restrepo Girona) to request the cash benefits due as a consequence of his father's murder.

698.    He was detained by members of the AUC paramilitaries who forced him on to a pick-up

truck.  They killed him in the town center of Apartadó.

699.    Jane Does is filing on behalf of John Doe 175

700.     On information and belief, Chiquita and the Defendants caused, intended, conspired in,

and/or aided and abetted the death of John Doe 175 through their support of the AUC in Urabá,

which at the time of the events was in control of the region.


*Jane Doe 187/John Doe 176*

701.    Jane Doe 187's father, John Doe 176 was a banana worker.

702.    In December 1997, members of the AUC came to the farm and held a meeting there.

After the meeting, they tied him up, took him away, and killed him.

703.    Jane Doe 187 brings this action on behalf of John Doe 176.

704.    On information and belief, Chiquita and the Defendants caused, intended, conspired in,

and/or aided and abetted the death of John Doe 176 through their support of the AUC in Urabá,

which at the time of the events was in control of the region.


*Jane Doe 188/John Doe 177*

705.    Jane Doe 188's son John Doe 177 was a banana worker on the Santa Marta farm. In

December 1997, he was in his house when three men who identified themselves as members of

the AUC paramilitaries arrived there. They asked him to go with them, the following day, he was found dead.

706.    Jane Doe 188 brings this action on behalf of John Doe 177

707.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 177 through their support of the AUC in Urabá, which at the time of the events was in control of the region.


*Jane Doe 189/John Doe 178*

708.    Jane Doe 189's son John Doe 178 was a mechanic who worked in Apartadó. In October 1997, he was killed by the AUC paramilitaries who arrived at La Chinita and killed him there.

709.    Jane Doe brings this action on behalf of John Doe 178.

710.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 178 through their support of the AUC in Urabá, which at the time of the events was in control of the region.


*Jane Doe 190/John Doe 179*

711.    Jane Doe 190's partner John Doe 179 was a banana worker. He was abducted from his house in by three members of the AUC paramilitaries, one of whom was alias "Mononegro."

712.    Jane Doe 190 brings this action on behalf of John Doe 179.

713.    They took him and killed him near the banana farm (*la bananera*). On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 179 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 164/John Doe 180*

714.    Jane Doe 164's son, John Doe 180 was a banana worker who had been forcibly displaced from Apartadó. He worked as a bus driver assistant.

715.    In September 1997, the AUC paramilitaries stopped the bus that John Doe 180 was working on. They shot him dead when he stepped out of the bus.

716.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 180 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 192/John Doe 181*

717.    Jane Doe 192's partner, John Doe 181 was a banana worker. He was killed by AUC paramilitaries in August 1997. Jane Doe 192 brings this action on his behalf.

718.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 181 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 174/John Doe 182/John Doe 196*

719.    Jane Doe 174's brothers John Doe 182 and John Doe 196 were forcibly displaced by the AUC paramilitaries. They were then killed by members of the AUC paramilitaries in August 1997 and 1998.

720.     Jane Doe 174 brings this action on behalf of her brothers.

721.    On information and belief, Chiquita and the Defendants caused, intended, conspired in,

107

and/or aided and abetted the death of John Doe 182 and John Doe 196 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 194/Jane Doe 195*

722.    Jane Doe 194's daughter, Jane Doe 195 was forcibly displaced to Apartadó.

723.    She was then found and kidnapped in August of 1997 by armed men from the AUC. The next day, she was found dead.

724.    Jane Doe 194 brings this action on behalf of Jane Doe 195.

725.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of Jane Doe 195 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 196/John Doe 183*

726.    Jane Doe 193's husband, John Doe 183 was a banana worker. He was killed in April 1996 by the AUC.

727.    Jane Doe 196 brings this action on behalf of John Doe 183.

728.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 183 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 197/John Doe 184*

729.    Jane Doe 197's son John Doe 184 was a banana worker. In March 1997. He was abducted from his house by five members of the AUC. His body was found in Chigorodó four days later

730.   Jane Doe 197 brings this action on behalf of John Doe 184.

731.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 184 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 198/John Doe 185*

732.   Jane Doe's brother, John Doe 185 was a banana worker. He was killed in March 1997 by the AUC together with four other banana workers.

733.   Jane Doe 198 brings this action on behalf of John Doe 185.

734.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 184 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 199/John Doe 186*

735.   Jane Doe 199's partner, John Doe 186 was a banana worker. In February 1997, after he made a claim for unpaid wages, he was killed by the AUC paramilitaries.

736.   Jane Doe 199 brings this action on behalf of John Doe 186.

737.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 186 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 200/ John Doe 187*

738.   John Doe 187 was a banana worker at a farm. In January 1997, he was murdered by the AUC in Apartado.

739.     Jane Doe 200 is filing on behalf of her partner, John Doe 187.

740.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 187 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 201/ John Doe 188*

741.     John Doe 188 was a banana worker. In December 1996, he was murdered by the AUC in Apartado.

742.     Jane Doe 201 is filing on behalf of her father, John Doe 188.

743.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 188 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 202/ John Doe 189 and John Doe 204*

744.     John Doe 189 was a banana worker at a Banadex farm and a member of the political party, Unión Patriótica. In December 1996, he was kidnapped and murdered by the AUC in Turbo. Two months after his death, the AUC disappeared his son, John Doe 204, in Apartado.

745.     Jane Doe 202 is filing on behalf of partner, John Doe 189, and her son, John Doe 204.

746.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the kidnapping and death of John Doe 189, and the disappearance of John Doe 204 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

747.     On information and belief, Chiquita and the Defendants benefited from the death of John

Doe 189 by removing a politically active Banadex employee whose actions threatened the stability and profitability of Chiquita's operations.

*Jane Doe 203/ John Doe 190*

748.    John Doe 190 was a banana worker. In November 1996, he was at a tavern in Chigorodo and was murdered by the AUC under the orders of an AUC leader known by the alias "Pablo."

749.    Jane Doe 203 is filing on behalf of her brother, John Doe 190.

750.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 190 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 204 and Jane Doe 205*

751.    Jane Doe 205, was murdered by the AUC in October 1996. Jane Doe 205 and her husband owned a farm in an area where the AUC organized one of its camps. After Jane Doe 205 and her husband refused to sell the farm, the AUC threatened and displaced them.  After, the AUC found Jane Doe 205 and killed her in Turbo.

752.    Jane Doe 204 is filing on behalf of her mother, Jane Doe 205.

753.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the forced displacement and death of Jane Doe 205 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 206/ John Doe 191*

754.    John Doe 191 was a banana worker at a farm. In September 1996, he was kidnapped and

murdered by the AUC in Apartado.

755.     Jane Doe 206 is filing on behalf of her partner, John Doe 191.

756.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 191 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Does 207 and 208/ John Doe 192*

757.     In 1996, Jane Doe 208 and John Doe 192, were forcibly displaced, kidnapped and murdered by the AUC in Turbo.

758.     Jane Doe 207 is filing on behalf of her mother, Jane Doe 208, and her father, John Doe 192.

759.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the displacement, kidnapping and deaths of Jane Doe 208 and John Doe 192 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 209/ John Doe 193*

760.     John Doe 193 was a contractor for Banadex. In September 1996, he was murdered by the AUC in Carepa.

761.     Jane Doe 209 is filing on behalf of her partner, John Doe 193.

762.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 193 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 210/ John Doe 194*

763.     John Doe 194 worked at a farm and was an activist for the political party Unión

Patriótica. In May 1996, he was murdered by the AUC in Turbo.

764.     Jane Doe 210 is filing on behalf of her partner, John Doe 194.

765.     On information and belief, Chiquita and the Defendants caused, intended, conspired in,

and/or aided and abetted the death of John Doe 194 through their support of the AUC in Urabá,

which at the time of the events was in control of the region.

766.     On information and belief, Chiquita and the Defendants benefited from the death of John

Doe 1949 by removing a politically active farm worker whose actions threatened the stability

and profitability of Chiquita's operations.


*Jane Doe 211/ John Doe 195*

767.     John Doe 195 was a banana worker at a farm. In 2000, he was disappeared by the AUC in

Mutata.

768.     Jane Doe 211 is filing on behalf of her partner, John Doe 195.

769.     On information and belief, Chiquita and the Defendants caused, intended, conspired in,

and/or aided and abetted the disappearance of John Doe 195 through their support of the AUC in

Urabá, which at the time of the events was in control of the region.


*Jane Does 193 and 212/ John Doe 209*

770.     In 1998, the AUC murdered Jane Doe 212, and disappeared her husband, John Doe 209,

in Turbo.

113

771.     Jane Doe 193 is filing on behalf of her daughter, Jane Doe 212, and her son-in-law, John Doe 209.

772.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of Jane Doe 212 and the disappearance of John Doe 209 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 179/ John Does 197, 198 and 200*

773.     The AUC disappeared three brothers – John Doe 198 in 2001, John Doe 197 in 2002 and John Doe 200 in 2004 – in Turbo. They were farmers. Their mother, Jane Doe 179, is recognized as a victim in the Justice and Peace proceedings.

774.     Jane Doe 179 is filing on behalf of her sons, John Does 197, 198 and 200.

775.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the disappearances of John Does 197, 198 and 200 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 169/ John Doe 201*

776.     John Doe 201 was a banana worker. In September 1999, he was disappeared by the AUC in Turbo. At the time of his disappearance, John Doe 201 was with his children and partner—whom the AUC murdered on the same day.

777.     Jane Doe 169 is filing on behalf of her brother-in-law, John Doe 201.

778.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the disappearance of John Doe 201 through their support of the AUC in

Urabá, which at the time of the events was in control of the region.

*Jane Doe 191/ John Doe 202*

779.    John Doe 202 was a banana worker. In April 2001, he was disappeared by the AUC in Carepa.

780.     Jane Doe 191 is filing on behalf of her brother, John Doe 202.

781.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the disappearance of John Doe 202 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 178/ John Doe 203*

782.    In November 1999, John Doe 203 was disappeared by the AUC in Turbo.

783.    Jane Doe 178 is filing on behalf of her father, John Doe 203.

784.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the disappearance of John Doe 203 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Does 205 and 206*

785.    John Doe 206 was a banana worker. In November 2002, he was disappeared by the AUC in Apartado.

786.    John Doe 205 is filing on behalf of his son, John Doe 206.

787.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the disappearance of John Doe 206 through their support of the AUC in

Urabá, which at the time of the events was in control of the region.

*Jane Doe 207/ John Does 207 and 208*

788.    In March 1997, John Does 207 and 208 were disappeared by the AUC in Turbo. Before their disappearances, they received threats from the AUC because they denounced the AUC's murder of John Doe 207's parents to a prosecutor.

789.    Jane Doe 207 is filing on behalf of her brother, John Doe 207, and her partner, John Doe 208.

790.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the disappearances of John Does 207 and 208 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

## VII.    GENERAL ALLEGATIONS

791.    At all times, Chiquita, the Defendants, and Non-Party Executives knew or should have known that the AUC was a violent paramilitary organization continually engaging in vicious crimes and human rights violations against civilians in Colombia, including extrajudicial killing, torture, and forced disappearances.  The acts described herein were inflicted under color of law and under color of official authority, and/or in conspiracy with, and/or in a joint criminal enterprise with, and/or in concert with, and/or on behalf of those acting under color of official authority. The AUC has carried out its activities with both the tacit approval and active cooperation of official government security forces, pursuant to the overall war strategy of the Colombian government.  Moreover, high-ranking officials from across the Colombian government have been implicated in paramilitary collaboration, including at least fourteen members of Congress, seven former lawmakers, the head of the secret police, mayors, and

former governors. Furthermore, Chiquita's payments to the AUC were facilitated by *convivir*, which were licensed by and operated with the express authority of the government.

792.    The acts described herein were conducted in the course of an internal armed conflict as part of the Colombian government's war strategy.  The AUC and other paramilitaries were parties to this armed conflict that engaged in combat with guerrilla armies on behalf of the government; they committed the abuses against Plaintiffs as part of their prosecution of this conflict.  The AUC and other paramilitaries were engaged in this conflict in partnership with the Colombian military.  The acts described herein were part of a widespread and systematic attack by the paramilitaries against the civilian population of the banana-growing region, as well as against several discrete sub-populations, including but not limited to leftist politicians, labor organizers, community activists, persons considered socially undesirable, and perceived guerrilla sympathizers. This attack spanned a large swath of land in Colombia, resulted in the deaths of thousands of individuals, and was directed by a centrally-commanded paramilitary organization. On information and belief, at all relevant times Chiquita had knowledge of this attack.

793.    The acts and injuries to Plaintiffs described herein were part of a pattern and practice of systematic human rights violations paid for, facilitated, condoned, confirmed, aided and abetted, and/or ratified by Chiquita and/or committed in conspiracy with the AUC.

794.    As a direct and proximate result of Chiquita's unlawful conduct, Plaintiffs have suffered and will continue to suffer harm including pain and suffering, personal injuries, property damage, harm to their livelihoods, and extreme and severe mental anguish and emotional distress. Plaintiffs are thereby entitled to general and compensatory damages in amounts to be proven at trial.

795.    Plaintiffs' causes of action arise under and constitute torts under the following laws:

a) Alien Tort Claims Act, 28 U.S.C. § 1350;

b) Torture Victim Protection Act, 28 U.S.C. § 1350, note;

c) Customary international law;

d) Common law of the United States of America;

e) Statutes and common law of the State of New Jersey and the State of Florida, including but not limited to wrongful death, assault and battery, intentional infliction of emotional distress, negligent infliction of emotional distress, negligence, negligent hiring, and loss of consortium; and the

f) Laws of Colombia.

796.    Legal action by Plaintiffs in Colombia would be futile. In June 2004, Chiquita sold its Colombian subsidiary, Banadex.  On information and belief, Chiquita no longer owns any production operations in Colombia and is not subject to service there.  Furthermore, the political and legal system in Colombia is characterized by virtual impunity for the crimes of paramilitaries and those who assist them.  The vast majority of arrest warrants for paramilitary leaders are never carried out, and when such figures are arrested they are frequently released or allowed to escape from security facilities.  Military officers accused of collaboration with paramilitaries are routinely exonerated or given token sentences by military courts.  Prosecutors, investigators, and judicial officials who pursue cases of human rights abuses implicating paramilitaries are subject to death threats and assassinations, and many have had to resign or flee the country as a result.

797.    Legal action by Plaintiffs in Colombia would also result in serious reprisals.  Individuals who seek redress for paramilitary crimes committed against them or their family members are regularly targeted for further retributive violence.

118

798.   Chiquita, the Defendants, and Non-Party Executives took active steps to conceal its payments and other forms of support to the AUC.  *See supra* (Decisions to conceal payments made at high levels within Chiquita).

799.   This concealment had the effect of preventing Plaintiffs from learning that Chiquita was responsible for their injuries.  Plaintiffs were unaware of Chiquita's support of the AUC until shortly after Chiquita's guilty plea in March of 2007.

800.   Chiquita's concealment of its role in plaintiffs' injuries prevented Plaintiffs from filing their claims at an earlier date.

801.   Plaintiffs were additionally unable to bring suit in Colombia or the United States until 2007 due to the poor security situation and the danger of reprisals, to which Chiquita's support of the AUC contributed.

802.   Several of the AUC paramilitary units active in the banana-growing region, including Bloque Norte and the Bloque Elmer Cárdenas, did not demobilize until 2006.

803.   Throughout this period, paramilitaries continued to kill and make threats against civilians in the banana-growing region.  In 2006, several human rights workers received death threats, including lawyers challenging paramilitary violence.

## VIII. CLASS ACTION ALLEGATIONS

804.   Plaintiffs seek certification of this action as a class action pursuant to Rules 23(b)(1)(B), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.  Plaintiffs allege that Chiquita intentionally supported a campaign of military and social control by the AUC from at least 1995 through 2004.  Plaintiffs seek to represent a class consisting of all persons who were the victims (or who are the relatives and/or legal representatives of decedent victims) of extrajudicial killing; forced disappearance; torture; cruel, inhuman, or degrading treatment; kidnapping; rape; forced

displacement; crimes against humanity; or crimes against civilians constituting war crimes committed by the AUC in the banana-growing region of Urabá from 1995 through 2004.

805.    The members of the Class are so numerous that joinder of all members is impractical. The exact number and identities of all Class members is not currently known. According to reliable statistics, however, the AUC was responsible for many thousands of killings and many hundreds of massacres in Colombia between 1995 and 2004.  In the banana-growing region of Urabá alone, human rights organizations have documented over 3,700 murders by the AUC between 1997 and 2004 and 60,000 forced displacements during the same period. These figures suggest that the Class at minimum numbers in the thousands and may exceed ten thousand.

806.    Plaintiffs' claims are typical of those of the Class. Plaintiffs, like all members of the Class, were civilians inhabiting Colombia during the time period in which the AUC received substantial financial and other assistance from Chiquita, the Defendants, and Non-Party Executives, and who were injured by the AUC.  The abuses committed by the AUC were committed as part of the AUC's campaign, supported by Chiquita, the Defendants, and Non-Party Executives, to exert control over the banana-growing region and eliminate the FARC by terrorizing civilians and perceived opponents.

807.    Plaintiffs will fairly represent the interests of the Class because their interest in the case is identical to that of the Class as a whole: to prosecute the claims alleged herein to obtain full compensation due to them for the conduct of which they complain.  Plaintiffs' claims implicate the common questions of law and fact listed below, as do the claims of all or virtually all members of the Class.  Plaintiffs have no interests that conflict with or are contrary to the interests of other Class members.

808.    Plaintiffs will adequately represent the class in that their personal interest in the outcome of the case ensures that they will maintain an active awareness and involvement in the litigation so as to protect their own interests and those of the Class.  Furthermore, they are represented by counsel with extensive experience in international human rights and class action litigation.

809.    There are questions of law and fact that are common to the Class, including but not limited to:

a)   whether Chiquita, the Defendants, and the Non-Party Executives knew, should have known, or recklessly ignored, that the AUC was responsible for the extrajudicial killing, forced disappearance, kidnapping, rape, forced displacement, property destruction, torture, or cruel, inhuman, or degrading treatment of civilians who lived in Colombia;

b)   whether the assistance provided to the AUC by Chiquita, the Defendants, and the Non-Party Executives  was substantial;

c)   whether Chiquita, the Defendants, and the Non-Party Executives knew, should have known, recklessly ignored, or intended that the payments they made to the AUC were used to finance a campaign of terror directed at the civilian population in Colombia's banana growing region;

d)   whether the AUC acted as an agent of Chiquita, the Defendants, and the Non-Party Executives in carrying out its campaign of murder and intimidation including whether they ratified such acts;

e)   whether Chiquita, the Defendants, and the Non-Party Executives conspired with, entered into a joint criminal enterprise with, or aided and abetted the AUC;

f)   whether Chiquita, the Defendants, and the Non-Party Executives facilitated the clandestine and illegal transfer of arms and ammunition to the AUC;

121

g) whether Chiquita, the Defendants, and the Non-Party Executives facilitated the AUC's drug shipments;

h) whether the AUC in committing the acts alleged herein acted under the color of state law and/or in a joint venture with official Colombian security forces;

i) whether the actions of the AUC constitute war crimes;

j) whether the actions of the AUC constitute crimes against humanity;

k) whether Chiquita, the Defendants, and the Non-Party Executives' actions constitute torts under the Alien Tort Statute, the Torture Victim Protection Act, or New Jersey, Florida, or Colombia law;

l) whether Chiquita, the Defendants, and the Non-Party Executives have been unjustly enriched by the violations set forth herein;

m) Chiquita, the Defendants, and the Non-Party Executives' behavior was negligent, including whether any of them engaged the AUC as an independent contractor and the AUC was incompetent and/or hired to do work that posed a risk of physical harm, whether there was a foreseeable risk of harm, and whether imposing a duty is fair;

n) the statutes of limitations are equitably tolled due to the conflict in Colombia or Chiquita's concealment of its actions;

o) whether Colombian statutes of limitations apply to the non-ATS claims;

p) whether this Court should order restitution or disgorgement of revenues and profits relating to the violations described herein; and

q) whether Chiquita, the Defendants, and Non-Party Executives should be subject to awards of compensatory and/or punitive damages and the proper measure thereof.

810.     Pursuant to Fed. R. Civ. P. 23(b)(1)(B), adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications and/or would substantially impair or impede their ability to protect their interests.

811.     Statistics gathered on human rights abuses committed by the AUC during the years 1997 to 2004 indicate that the Class at minimum numbers in the thousands and may exceed ten thousand.  *See supra*.  In other cases involving claims for human rights abuses under the Alien Tort Statute and the Torture Victims Protection Act, individual plaintiff cases have received multi-million-dollar recoveries.

812.     Successful actions against the Defendants pursued independently by individual Class members could thus result in combined damages that exceed the damages that the Defendants can currently afford to pay.

813.     Upon information and belief, the amount of damages which the Defendants can currently afford to pay is exceeded by the claims of the Class members.

814.     Pursuant to Fed. R. Civ. P. 23(c)(4), class certification is appropriate as to the issues common to the Class members' claims, identified above, as resolution of these issues would materially advance the litigation and class resolution of these issues is superior to repeated litigation of these issues in separate trials.

815.     In the alternative, certification pursuant to Fed. R. Civ. P. 23(b)(3), is appropriate as questions of law and fact common to the members of the class predominate over any questions affecting only individual members.  The vast majority of Plaintiffs' allegations implicate questions of liability relevant to the entire Class, some of which are identified above; their

resolution would therefore address most of the issues required to establish or disprove the Defendant's liability for the injuries of all Class members.

816.    Also pursuant to Fed. R. Civ. P. 23(b)(3) a class action is superior to other available methods for the fair and efficient adjudication of the controversy.


## IX. CLAIMS FOR RELIEF

### A.  First Claim for Relief – War Crimes

817.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

818.    The AUC's conduct alleged in this complaint constitutes violence to life and person, including extrajudicial killing, torture, mutilation, the taking of hostages, the carrying out of executions without previous judgment pronounced by a regularly constituted court, incidents of outrages upon human dignity, forced movement, pillage, and denial of medical treatment.

819.    The AUC's acts violate the law of nations in that they were committed in the course of war crimes, because 1) an armed conflict was ongoing; 2) the AUC was a party to the conflict; 3) Plaintiffs and countless other victims of the AUC's acts did not take active part in the hostilities; and 4) the acts were committed in the course of armed conflict.  These acts are thus war crimes regardless of whether the AUC acted under color of state authority.

820.    The war crimes described herein constitute torts that give rise to federal jurisdiction under the Alien Tort Statute (28 U.S.C. § 1350), as well as violations of customary international law and the common law of the United States, the statutes and common law of New Jersey and Florida, and the laws of Colombia. Leaders, organizers, instigators, and accomplices

participating in the formulation of these acts are responsible for all acts performed by any person in execution of such plan.

821.    The Defendants are liable to Plaintiffs because they aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC in bringing about the war crimes committed against Plaintiffs.

*i)    The civil war in Colombia is an armed conflict within the meaning of the laws of war.*

822.    The Colombian civil war is an "armed conflict not of an international character," as specified in Common Article 3 of the Geneva Conventions, which hold that in such cases, specific acts such as torture and "carrying out of executions without previous judgment pronounced by a regularly constituted court" constitute war crimes when committed against non-combatants.

823.    There is no dispute that at all relevant times, and up until the present, Colombia has been devastated by a long-standing civil conflict. This has been widely documented and, to Plaintiffs' knowledge, has never been disputed in this or any other case. For example, the State Department noted in 1997 that the Colombian government's control of national territory "has been increasingly challenged by longstanding and widespread internal armed conflict and rampant violence. . ." *1997 Human Rights Report: Colombia*, at 1.

824.    During all times relevant to this complaint, the civil war in Colombia pitted the Colombian government – along with its paramilitary allies, including the AUC – against the FARC and other left-wing guerrilla insurgents.  The Colombian civil war has continued uninterrupted since at least 1946, and has claimed the lives of over 300,000 people.  Both Venezuela and Ecuador´s presidents have referred to the FARC as a belligerent force.  The

Colombian government has engaged in prisoner exchanges with the FARC in the past.  It held

extensive negotiations with the FARC during the 1998–2002 time period, with involvement of

the United Nations, and ceded a large portion of its territory to FARC control, referred to as the

*zona de despeje*, or cleared zone.  During that time, the FARC assumed the powers of

government in the area under its control, including judicial and police powers.


   *ii)*    *The AUC was a party to the armed conflict in Colombia.*

825.    Once Colombia's various paramilitary groups consolidated in 1997 under the leadership

of Carlos Castaño, the AUC became the most visible armed opposition to the FARC, which, by

late 1996, had become Colombia's most prominent leftist rebel group. From that time until its

demobilization, the AUC was a major combatant in Colombia's civil conflict with the FARC.  In

most of the rural areas where the FARC had its strongholds, the Colombian military ceded

military operations to the AUC.  By 2001, the conflict between the AUC and the FARC had

become a notorious exchange of atrocities.  *See also supra* (the AUC role in the Colombian civil

war as a tool of the Colombian government, and its campaign of violence against civilians).


   *iii)*    *Plaintiffs did not take active part in the hostilities.*

826.    Civilians are entitled to the protections of Common Article 3 of the Geneva Conventions

if they are "[p]ersons taking no active part in the hostilities."  Neither surviving Plaintiffs nor

decedents were party to the armed conflict in Colombia, as they were not members of the FARC,

the AUC, or, indeed, any armed group that participated in the conflict.  *See supra* (describing

Plaintiffs).

827.    Plaintiffs' decedents were not killed because they or anyone related to them had taken

part in the hostilities in any way.  Rather, they were victims of the campaign conducted against

civilians by the AUC in an effort to discourage support of the FARC.  The AUC systematically murdered thousands of civilians without regard to whether they were actual participants in the civil war, as a warning to any potential guerrilla supporters. The AUC became known for using chain saws and machetes to dismember its victims in order to ensure that witnesses to this violence would never harbor or assist FARC guerrillas in their villages.

iv)  *Plaintiffs were killed in the course of the armed conflict.*

828.    Decedents were not killed simply against the background of war; rather, the use of criminal violence and intimidation against civilians was part of the war strategy against the FARC agreed on by the AUC and the Colombian Government, in which Chiquita was intentionally complicit.

829.    The AUC used extremely violent means to take back areas held by the FARC and employed tactics of violence and terror to target civilians regardless of whether they were participants in the civil war, with the intention of discouraging civilians from supporting the leftist guerrillas. This military tactic is documented by the U.S. Department of State.  *See supra* (State Department reports documenting human rights abuses, including forced displacement)

830.    While this strategy was developed in Urabá, the model of collaboration between government and paramilitary was so successful that it was exported to the rest of the country and became part of the national war strategy. *See supra* (paramilitarism model spread to Magdalena and elsewhere).

831.    Decedents were all members of particular social groups that were particularly targeted by the AUC as part of its war strategy.  *See supra*  (AUC targeted particular groups, Plaintiffs' Injuries).

832.     In fact, all decedents were executed by the AUC as it used tactics of terror and violence, particularly in the areas that the FARC had a stronghold.  They were not merely incidental victims during a time of war; rather, they were victims of the war strategies and goals agreed on by the AUC and the Colombian state.

### B.  Second Claim for Relief – Crimes Against Humanity

833.     The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

834.     The conduct alleged in this complaint includes willful killing, torture, and arbitrary arrest and detention constituting crimes against humanity, in that the AUC carried out these acts 1) as part of a widespread or systematic attack 2) against a civilian population.  Leaders, organizers, instigators, and accomplices participating in the formulation of these acts are responsible for all acts performed by any person in execution of such plan.  The acts of the AUC constitute crimes against humanity regardless of whether the AUC acted under color of state authority.

835.     The crimes against humanity described herein constitute torts that give rise to federal jurisdiction under the Alien Tort Statute and Torture Victims Protection Act (28 U.S.C. § 1350), as well as violations of customary international law and the common law of the United States, the statutes and common law of New Jersey and Florida, and the laws of Colombia.

836.     The Defendants are liable to Plaintiffs because they aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC in bringing about the crimes against humanity committed against Plaintiffs.

*i)     The killings alleged herein were part of a widespread and systematic attack.*

837.    From late 1996 on, the AUC became a major combatant in Colombia's civil conflict with the FARC. In most of the rural areas where the FARC had its strongholds, the Colombian military had ceded military operations to the AUC. By 2001, the conflict between the AUC and the FARC had become a notorious exchange of atrocities. The AUC became notorious for using tactics of terror on civilians living in and around areas that had been under FARC control.  *See supra* (AUC strategy of targeting civilians in Urabá).

838.    The AUC killed thousands of civilians in Urabá.  Their war strategy involved killing civilians in towns near guerrilla groups in order to intimidate the population from providing any support to the guerrillas. This included anyone supporting the guerrillas' ideology, such as teachers, community leaders, social activists, trade unionists, human rights defenders, religious workers, and leftist politicians.  Many others not belonging to these groups were killed as well, as part of the AUC's efforts to establish complete dominance and deter support for the guerrillas.

839.    Decedents were all killed as part of a systematic attack on particular societal groups.  *See supra*  (Plaintiffs' Injuries).  In fact, all of Plaintiffs' decedents were executed by the AUC as it used tactics of terror and violence, particularly in the areas that the FARC had a stronghold. They were not merely incidental victims during a time of war; rather, they were victims of the war strategies and goals agreed on by the AUC and the Colombian state.

   *ii)*   *The killings alleged herein were part of an attack that was directed against a civilian population.*

840.    Decedents were killed as part of the AUC's strategy of terrorizing the civilian population of Urabá to discourage people from supporting the guerrilla insurgency.  By design, this attack was carried out without regard to whether the victims were actual participants in the civil war.  In fact, AUC commanders explicitly intended to kill civilians, with the understanding that such

practices would deprive the guerrillas of their support base. *See supra* (State Department reports, AUC's war strategies).

### C. Third Claim for Relief – Terrorism

841. The allegations set forth in the above paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

842. The conduct alleged in this complaint constitutes violations of the customary international law prohibition on terrorism, in that the AUC 1) directed violence against a civilian population 2) in order to coerce or intimidate that population. The acts of the AUC constitute terrorism regardless of whether the AUC acted under color of state authority.

843. The acts of terrorism described herein constitute torts that give rise to federal jurisdiction under the Alien Tort Statute (28 U.S.C. § 1350), as well as violations of customary international law and the common law of the United States, the statutes and common law of New Jersey, Florida and the laws of Colombia.

844. The Defendants are liable to Plaintiffs because they aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC in bringing about the acts of terrorism committed against Plaintiffs.

  *i)* *The killings alleged herein constitute violence directed against the civilian population of Urabá.*

845. Plaintiffs, decedents, as well as the vast majority of AUC targets in Urabá, were civilians and non-participants in Colombia's civil war.

ii)  *The killings alleged herein were committed in order to coerce or intimidate the civilian population of Urabá and Colombia at large from supporting the FARC.*

846.  The AUC targeted not only guerrilla sympathizers but anyone suspected of supporting their leftist ideology, such as teachers, community leaders, trade unionists, human rights defenders, religious workers, and leftist politicians.  The AUC targeted civilians in towns and neighborhoods where guerrilla support was believed to be high because they claimed guerrilla groups could only operate in the region with the logistical support of local towns.  *See supra* (AUC war strategy).

847.  Killing the decedents was part of the general strategy of the AUC.  Through these murders, the AUC intended to deter others from providing support or from expressing views that could be construed as supporting the FARC or their ideology. *See supra* (Plaintiffs' Injuries).

### D.  Fourth Claim for Relief – Material Support to Terrorist Organizations

848.  The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

849.  The conduct of Chiquita, the Defendants, and the Non-Party Executives alleged herein constitutes violations of the customary international law prohibition on the illegal provision of material support to terrorist organizations, in that they 1) provided assets 2) to a terrorist organization 3) with the knowledge or intent that they would be used to carry out attacks on civilians 4) for the purpose of intimidating or coercing a civilian population.  Chiquita, the Defendants, and Non-Party Executives' conduct constitutes material support to terrorist organizations, regardless of whether they acted under color of state authority.

850.  The acts of material support to the AUC, a terrorist organization, described herein constitute torts that give rise to federal jurisdiction under the Alien Tort Statute (28 U.S.C. §

1350), as well as violations of customary international law and the common law of the United States, the statutes and common law of New Jersey and Florida, and the laws of Colombia. Leaders, organizers, instigators, and accomplices participating in the formulation of these acts are responsible for all acts performed by any person in execution of such plan.

851.    The Defendants are liable to Plaintiffs because they directly participated in the provision of material support to the AUC, and/or they aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with others, including members of the AUC, to provide material support to the AUC, whose terrorist actions caused Plaintiffs' injuries.

i)   *Chiquita, the Defendants, and Non-Party Executives provided assets to the AUC in the form of money, arms and logistical support.*

852.    Chiquita, the Defendants, and Non-Party Executives provided a variety of forms of material support to the AUC, including cash and assistance in trafficking weapons and drugs. The support that Chiquita provided was crucial to the AUC's success against the FARC in the area and its ability to continue killing civilians.  Indeed, prominent AUC commanders considered the group's success in smuggling in massive quantities of arms – some of which were still being used by the paramilitaries to commit crimes as recently as 2008 – as one of the AUC's greatest achievements.  This success was made possible partially by Chiquita's money and the use of Chiquita's port at Turbo.  *See supra* (Chiquita's support to the AUC).

ii)   *The AUC was at all relevant times a terrorist organization.*

853.    At all times relevant to this Complaint, the AUC was an organization engaged in acts of premeditated, politically-motivated violence against noncombatant targets. *See supra* (AUC's strategy of terrorizing civilians).

854.    The AUC's terrorist activities have been well-known at all relevant times, and, on information and belief, Chiquita, the Defendants, and the Non-Party Executives were aware of such activities.  From September 10, 2001, until the present, the AUC has been designated by the United States government as a Foreign Terrorist Organization. *See supra* (Chiquita's knowledge).

iii)    *Chiquita knew and intended that the support it provided to the AUC would be used to carry out attacks on the civilian population of Urabá for the purpose of intimidating that population.*

855.    Chiquita knew of and intentionally supported the AUC's strategy of targeting civilians in order to intimidate the population of Urabá from supporting the FARC.  Chiquita provided this support in exchange for security and stability on the banana plantations, which the AUC achieved through the murder or disappearance of civilians such as union leaders, community activists, and suspected criminals.  *See supra* (knowing and intentional support).

### E.  Fifth Claim for Relief – Extrajudicial Killing

856.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

857.    The extrajudicial killings alleged herein constitute torts that give rise to federal jurisdiction under the Alien Tort Statute (28 U.S.C. § 1350), as well as violations of the Torture Victim Protection Act (28 U.S.C. § 1350 note), customary international law, the common law of

the United States, the statutes and common law of New Jersey and Florida, and the laws of Colombia.

858.    The AUC committed acts of extrajudicial killing in that they carried out 1) deliberate killing of decedents 2) not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.

859.    The Defendants are liable to Plaintiffs because they aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC, which was acting under color of law through its collaboration with the Colombian civilian government and military, to bring about the extrajudicial killings committed against Plaintiffs.

  i)    *The AUC's killings were carried out deliberately as part of the role assigned to them by the Colombian State to repress support of the FARC, but unauthorized by a judgment pronounced by any court.*

860.    The AUC killed Plaintiffs' decedents as part of the Colombian state policy of intimidating civilians from supporting the FARC.  *See supra* (state action). The AUC committed many of these murders in the presence of family members or other community members, or they subsequently reported to the family that they were responsible for the killings.  They openly killed civilians and discussed such killings in public in order to intimidate and threaten others.

861.    While the state supported the AUC in these efforts, they did not authorize them to commit these killings through a court judgment.  In fact, AUC leaders have stated that the military would give them names of alleged guerrillas to kill when the state did not have enough evidence to prosecute the individuals through Colombian courts.

862.    None of the decedents was killed pursuant to *any* judicial process at all.

863.    Killing the decedents was part of the general strategy of the AUC and Chiquita.  Through these murders, the AUC and Chiquita intended to deter others from supporting the FARC or their ideology.  *See supra* (Plaintiffs' Injuries).

### F.  Sixth Claim for Relief – Torture

864.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

865.    The acts of torture alleged herein constitute torts that give rise to federal jurisdiction under the Alien Tort Statute (28 U.S.C. § 1350), as well as violations of the Torture Victim Protection Act (28 U.S.C. § 1350 note), customary international law, the common law of the United States, the statutes and common law of New Jersey and Florida, and the laws of Colombia.

866.    The AUC committed acts of torture in that they 1) intentionally 2) caused Plaintiffs and their decedents to suffer severe mental or physical pain or suffering 3) for the purpose of punishing, intimidating or coercing Plaintiffs and their decedents.

867.    The Defendants are liable to Plaintiffs because they aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC, which was acting under color of law through its collaboration with the Colombian civilian government and military, to bring about the torture committed against Plaintiffs.

   *i)    The AUC caused Plaintiffs and their decedents to suffer severe mental and physical pain and suffering.*

868.    Plaintiffs' decedents were in the custody of the AUC when they were tortured and killed. The family members of Jane Doe 2, Jane Doe 4, and John Doe 4, witnessed AUC members

seeking out their relatives and executing them. AUC paramilitaries removed John Doe 2 from a bus in the presence of others and executed him. John Does 5, 8, 9, 10, and 11 were kidnapped and executed by the AUC; their family members only found out about their deaths after an anguishing period of uncertainty. At the time that the AUC paramilitaries murdered decedents, the paramilitaries had effective control of decedents by virtue of their numbers and weapons.

869.    The AUC's torture and execution of the decedents caused them severe mental and physical pain. *See supra* (Plaintiffs' Injuries).

870.    The surviving Plaintiffs suffered severe mental and physical pain upon witnessing or learning of the murder of their family members. Individual Plaintiffs also experienced suffering when they were threatened against pursuing investigations of the deaths of their family members and were forced to flee the area. Furthermore, they suffered severe mental anguish due the feelings of threat and fright that the AUC might target them, too.

> *ii)    The AUC tortured Plaintiffs and decedents as part of the role assigned to them by the Colombian State, to intimidate and deter them from supporting the FARC.*

871.    The AUC would often force its victims to disclose names of other potential guerrilla supporters. They took workers from the plantations and tortured them to the point that many would invent stories and names in the hope that the paramilitaries would let them go. Two union leaders reported that the paramilitaries would use tactics such as tying the worker's hands and feet, using chainsaws or pliers to break them to pieces, and pulling out their nails. The AUC used torture against civilians to intimidate them from providing support to guerrillas, as part of their fight against the guerrillas on behalf of the government. *See supra* (state action). On information and belief, the torture of Plaintiffs and decedents was intended to accomplish this goal.

### G. Seventh Claim for Relief – Cruel, Inhuman, or Degrading Treatment

872.    The allegations set forth in the above paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

873.    The acts of cruel, inhuman, or degrading treatment alleged herein constitute torts that give rise to federal jurisdiction under the Alien Tort Statute (28 U.S.C. § 1350), as well as violations of customary international law, the common law of the United States, the statutes and common law of New Jersey and Florida, and the laws of Colombia.

874.    The AUC committed acts of cruel, inhuman, or degrading treatment in that they inflicted mental or physical suffering, anguish, humiliation, fear, and debasement upon Plaintiffs and their decedents.  The acts described herein had the intent and the effect of grossly humiliating and debasing the Plaintiffs, forcing them to act against their will and conscience, inciting fear and anguish, and/or breaking their physical or moral resistance.  Plaintiffs were placed in great fear for their lives and were forced to suffer severe physical and psychological abuse and agony.

875.    The Defendants are liable to Plaintiffs because they aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC, which was acting under color of law through its collaboration with the Colombian civilian government and military, to bring about the cruel, inhuman, and degrading treatment committed against Plaintiffs.

   *i)*   *The AUC inflicted mental and physical suffering, anguish, humiliation, fear and debasement on Plaintiffs and their decedents as part of the role assigned to them by the Colombian State, to intimidate and coerce civilians from supporting the FARC.*

876.    The AUC used cruel, inhuman, and degrading treatment against civilians to intimidate them from providing support to guerrillas, as part of their fight against the guerrillas on behalf of the government.  *See supra* (state action; atrocious acts of AUC).  Both decedents and surviving

137

plaintiffs were victims of the AUC's cruel, inhuman, and degrading treatment.  *See supra* (Plaintiffs' Injuries; mental anguish of decedents and survivors).  The AUC targeted Plaintiffs' decedents because their actions and positions in the community were seen as supporting the FARC.

### H. Eighth Claim for Relief – Violation of the Rights to Life, Liberty and Security of Person and Peaceful Assembly and Association

877.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

878.    The violations of the rights to life, liberty and security of person and peaceful assembly and association alleged herein constitute torts that give rise to federal jurisdiction under the Alien Tort Statute (28 U.S.C. § 1350), as well as violations of customary international law, the common law of the United States, the statutes and common law of New Jersey and Florida, and the laws of Colombia.

879.    The AUC violated Plaintiffs' and their decedents' rights to life, liberty and security of person and peaceful assembly and association in that they carried out 1) a systematic campaign of terror and violence 2) conceived and arbitrarily waged by state agents 3) hatched and calculated to suppress political opinion and expression.

880.    The Defendants are liable to Plaintiffs because they aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, and/or conspired with the AUC, which was acting under color of law through its collaboration with the Colombian civilian government and military, to bring about the violations of the rights to life, liberty and security of person and peaceful assembly and association committed against Plaintiffs.

  *i) Members of the AUC, as State agents and at the behest of State agents, carried out a systematic campaign of terror and violence.*

881. The AUC carried out a campaign of terror and violence against civilians to intimidate them from providing support to guerrillas, as a central strategy of their fight against the guerrillas on behalf of the government.  *See supra* (atrocious acts of AUC; state action).

882. Decedents were killed in the course of the AUC's terrorist campaign against civilian populations.

  *ii) The AUC's campaign was hatched and calculated to suppress any political activity or expression that could be suspected of association with support for the FARC.*

883. One of the overriding purposes of the AUC's campaign of terror against civilians, including Plaintiffs and decedents, was to intimidate and coerce civilians in Urabá against supporting the FARC or, indeed, any political ideology that could be associated with the FARC. This could and often did include the violent suppression of any form of political or social organization activity outside of those forms specifically endorsed by the paramilitaries and the government.  *See supra* (goals and tactics of AUC)

884. Decedents were killed to suppress their political expression and to prevent them and others from giving political support to the ideologies associated with the FARC.  *See supra* (Plaintiffs' Injuries).

 **I. Ninth Claim for Relief – Consistent Pattern of Gross Violations of Internationally Recognized Human Rights**

885. The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

886.    The consistent pattern of gross violations of internationally recognized human rights alleged herein constitutes torts that give rise to federal jurisdiction under the Alien Tort Statute (28 U.S.C. § 1350), as well as violations of customary international law, the common law of the United States, the statutes and common law of New Jersey and Florida, and the laws of Colombia.

887.    The AUC carried out a consistent pattern of gross violations of internationally recognized human rights against Plaintiffs, their decedents, and others in that the above-described abuses against Plaintiffs and decedents occurred within the context of numerous similar abuses and killings.

888.    The Defendants are liable to Plaintiffs because they aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC, which was acting under color of law through its collaboration with the Colombian civilian government and military, to bring about the consistent pattern of gross violations of internationally recognized human rights committed against Plaintiffs.

   i)   *The AUC committed its acts of abuse against Plaintiffs and their decedents in the context of a consistent pattern of abuses.*

889.    The torture, murder, and other abuses committed against decedents, surviving Plaintiffs, and their family members was committed as part of and in the context of a consistent pattern of abuses that constitute gross violations of internationally recognized human rights.  These abuses include violations of the right to life, right to security of person, right to security of property, right to privacy, right to freedom of political expression and social organization, and many others.

140

890.    The specific acts constituting these violations include thousands of murders and incidents of torture and cruel, inhuman and degrading treatment, forced displacement, unwarranted intrusions into the private medical information and decisions of banana workers, suppression of union activity and peaceful political dissidence. *See supra* (AUC war strategy, State Department reports, control of medical services).

**J.   Tenth Claim for Relief – Wrongful Death**

891.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

892.    The acts described herein constitute wrongful death, actionable under the laws of New Jersey, Florida, the United States, and Colombia.

893.    The Defendants are liable to Plaintiffs 1) decedents died as a proximate result of the Decedent's acts and omissions and 2) decedents would have been able to maintain an action against the Defendants for damages resulting from their injuries had they survived.

894.    As a result of the deaths described above, Plaintiffs have sustained pecuniary loss resulting from the loss of society, comfort, attention, services, and support of the decedents.

895.    The Defendants are liable to Plaintiffs because they aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC in bringing about the wrongful deaths of the decedents.

*i)   The AUC caused decedents' deaths as a result of its overt acts of killing.*

896.    The AUC's intentional abduction and execution of decedents, as part of its campaign of terror against the civilians of Urabá, which was intentionally and knowingly supported by Chiquita, directly caused the deaths of decedents. *See supra* (Plaintiffs' Injuries).

ii)   *If decedents had not died, they would have been able to maintain an action for damages resulting from their injuries.*

897.   Decedents' injuries – both physical and emotional – were caused by intentional and negligent actions and omissions of Chiquita and the Defendants.  Had they not died, they could have maintained actions for damages against Chiquita and the Defendants under the laws of Colombia, New Jersey, Florida, the United States, and the law of nations.  Their surviving family members therefore may maintain an action for their wrongful death.

### K. Eleventh Claim for Relief – Assault and Battery

898.   The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

899.   The acts described herein constitute assault and battery, actionable under the laws of New Jersey, Florida, the United States, and Colombia.

900.   Chiquita, the Defendants, and Non-Party Executives' actions alleged herein constitute assault and battery in that they 1) acted with the intention of causing offensive and harmful touching of Plaintiffs' or decedents' persons without their consent, and/or 2) they acted with the intention of creating the imminent apprehension that such touching would result, and 3) such touching or apprehension of touching resulted.

901.   As a result of these acts, Plaintiffs were placed in great fear for their lives and suffered severe physical and psychological abuse and agony.

902.   Chiquita, the Defendants, and Non-Party Executives' acts were willful, intentional, wanton, malicious, and oppressive.

903.   The Defendants are liable to Plaintiffs because they aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC in bringing about the assault and battery of Plaintiffs and decedents.

  i)   *Members of the AUC attacked decedents intending to cause decedents to suffer harmful contacts or an imminent apprehension of an immediate harmful contact without their consent.*

904.   The AUC abducted and killed decedents, in some cases in front of Plaintiffs and their family members.  In so doing, the AUC intended to cause decedents to suffer dangerous, harmful, and offensive physical contact without their consent, and also to frighten them with the imminent apprehension of such contact, and they also intended to frighten surviving Plaintiffs with the imminent apprehension of such contact.  *See supra* (Plaintiffs' injuries).

  ii)   *Decedents suffered harmful contacts or a reasonable, imminent apprehension of harmful contacts because of the AUC's attacks.*

905.   The AUC's acts of kidnapping, killing, and torture alleged herein included harmful physical contact that caused injury and death to decedents without their consent, and acts of physical and emotional intimidation that caused decedents and surviving Plaintiffs to suffer the fright and apprehension of immediate harmful physical contact.

## L.  Twelfth Claim for Relief – Intentional Infliction of Emotional Distress

906.   The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

143

907.    Chiquita, the Defendants, and Non-Party Executives' outrageous conduct constitutes the intentional infliction of emotional distress and is actionable under the laws of New Jersey, Florida, the United States, and Colombia.

908.    Chiquita, the Defendants, and Non-Party Executives' conduct alleged herein constitutes intentional infliction of emotional distress in that it 1) was intentional and/or reckless, 2) was extreme and outrageous, and 3) caused 4) severe distress to Plaintiffs and decedents.

909.    As a direct and proximate result of Chiquita, the Defendants, and Non-Party Executives' acts, Plaintiffs were placed in great fear for their lives and were forced to suffer severe physical and psychological abuse and agony.

910.    The Defendants are liable to Plaintiffs because they  aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC in bringing about the intentional infliction of emotional distress of Plaintiffs and decedents.

    *i)*   *Chiquita, the Defendants, and Non-Party Executives acted intentionally and recklessly, with the intent and/or deliberate disregard of the high possibility that their support, assistance, direction, and collusion with the AUC would cause the acts alleged herein and cause severe humiliation, mental anguish, and emotional and physical distress.*

911.    By continuing to provide financial support, arms, and assistance in smuggling drugs, as well as facilitating, condoning, and conspiring with the AUC to carry out the Colombian government's violent paramilitary campaign against civilians, Chiquita, the Defendants, and Non-Party Executives intentionally acted, with the intent and/or deliberate disregard of the high possibility that their conduct would lead to the abduction, torture, and killing of decedents, causing severe humiliation, mental anguish, and emotional distress to decedents, surviving

Plaintiffs, and their families.  *See supra* (Chiquita's support to the AUC; aiding and abetting; conspiracy; agency).

912.   At all relevant times, it was in Chiquita, the Defendants, and Non-Party Executives' power to cease their assistance, support, facilitation, condonation, and conspiracy with the AUC or to prevent or prohibit such conduct, but instead they continued in their course of conduct continuously from 1995 until at least 2004.

   *ii)   Chiquita, the Defendants, and Non-Party Executives' conduct was so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community, and was without privilege or justification.*

913.   Chiquita, the Defendants, and Non-Party Executives' conduct alleged herein violated the laws of Colombia, New Jersey, Florida, and the United States, as well as the law of nations.  War crimes, crimes against humanity, torture, extrajudicial killing, cruel, inhuman and degrading treatment, violations of the right to life, liberty, security of person, and peaceful assembly and expression, terrorism, material support of terrorism, and consistent patterns of gross violations of internationally recognized human rights are acts that are so heinous that they are considered to be of universal and mutual concern to all nations of the world, such that nations have a legally binding obligation to punish and prevent them.  Chiquita, the Defendants, and Non-Party Executives' complicity in such acts is therefore so extreme and outrageous in character as to be completely unjustifiable and intolerable in a civilized community.

   *iii)   Chiquita, the Defendants', and Non-Party Executives' actions in aiding, facilitating, paying, colluding with, and supporting the AUC caused Plaintiffs' and their decedents' distress.*

914.   By continuing to provide financial support, arms, and assistance in smuggling drugs, as well as facilitating, condoning, and conspiring with the AUC to carry out the Colombian

government's violent paramilitary campaign against civilians, Chiquita, the Defendants, and Non-Party Executives proximately caused the injuries alleged in this complaint. Their involvement in the AUC's activities – including providing arms, money, and other assistance – began before Plaintiffs' injuries were incurred and continued long after. Chiquita, the Defendants, and Non-Party Executives' support foreseeably became a crucial component in the AUC's ability and motivation to attack Plaintiffs, decedents, and countless other civilians in Urabá. *See supra* (Chiquita's assistance to the AUC; assistance was substantial)

*iv)   The distress suffered by Plaintiffs is severe enough that no reasonable person could be expected to endure it.*

915.   The AUC's torture and execution of the decedents caused them severe mental and physical trauma prior to their deaths. *See supra* (Plaintiffs' Injuries).

916.   The AUC caused the surviving Plaintiffs severe mental and physical pain in witnessing or learning of the murder of their family members. Individual Plaintiffs also experienced suffering in being threatened against pursuing an investigation of the death, being forced to flee the area, and feeling threatened and frightened that the AUC would also target them. These fears, disturbances, and traumas constitute genuine and substantial distress, of a sort so severe that no person could reasonably be expected to endure it.

### M. Thirteenth Claim for Relief – Negligent Infliction of Emotional Distress

917.   The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

918.   Chiquita, the Defendants, and Non-Party Executives' conduct constitutes the negligent infliction of emotional distress and is actionable under the laws of New Jersey, Florida, the United States, and Colombia.

919.     Chiquita, the Defendants, and Non-Party Executives' conduct constitutes negligent infliction of emotional distress in that 1) they owed Plaintiffs and decedents a duty to act with reasonable care, 2) they breached that duty, 3) emotional distress was reasonably foreseeable, 4) Chiquita, the Defendants, and Non-Party Executives' conduct proximately caused the distress, and 5) the distress was genuine and substantial.

920.     As a direct and legal result of Chiquita, the Defendants, and Non-Party Executives' wrongful acts, Plaintiffs and decedents have suffered and will continue to suffer significant physical injury, pain and suffering, and extreme and severe mental anguish and emotional distress.

921.     The Defendants are liable to Plaintiffs because they aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC in bringing about the negligent infliction of emotional distress of Plaintiffs and decedents.

     *i)*   *Chiquita, the Defendants, and Non-Party Executives breached their duty to Plaintiffs by failing to act so as to stop engaging in the conduct described herein, and by failing to take steps in their power to prevent or prohibit such conduct.*

922.     By continuing to provide financial support, arms, and assistance in smuggling drugs, as well as facilitating, condoning, and conspiring with the AUC to carry out the Colombian government's violent paramilitary campaign against civilians, Chiquita, the Defendants, and Non-Party Executives breached their duty to Plaintiffs to act with reasonable care so as not to cause injury to them.  *See supra* (Chiquita's support, aiding and abetting, conspiracy, agency)

923.     At all relevant times, it was in Chiquita, the Defendants, and Non-Party Executives' power to cease their assistance, support, facilitation, condonation, and conspiracy with the AUC

or to prevent or prohibit such conduct, but instead they continued in their course of conduct continuously from 1995 until at least 2004.

    ii)   *Chiquita, the Defendants, and Non-Party Executives' conduct alleged herein proximately caused Plaintiffs and decedents to suffer emotional distress so severe that no reasonable person could be expected to endure it.*

924.    By continuing to provide financial support, arms, and assistance in smuggling drugs, as well as facilitating, condoning, and conspiring with the AUC to carry out the Colombian government's violent paramilitary campaign against civilians, Chiquita, the Defendants, and Non-Party Executives proximately caused the injuries alleged in this complaint.  Their involvement in the AUC's activities – including providing arms, money, and other assistance – began before Plaintiffs' injuries were incurred and continued long after.  Chiquita, the Defendants, and Non-Party Executives' support foreseeably became a crucial component in the AUC's ability and motivation to attack Plaintiffs, decedents, and countless other civilians in Urabá.  *See supra* (Chiquita's assistance to the AUC, assistance was substantial).

    iii)   *At all relevant times, Chiquita, the Defendants, and Non-Party Executives knew that their conduct would and did proximately result in physical and emotional distress to the AUC's victims.*

925.    From the moment of their first involvement with paramilitary groups, Chiquita, the Defendants, and Non-Party Executives were aware that their assistance, collusion, facilitating, and support would result in the killing, torture, and other abuses committed against countless civilians in Urabá by the AUC.

926.    At all relevant times, paramilitary groups like the ACCU and the AUC were notorious for their brutal methods and tactic of declining to discriminate between combatants and civilians. Their reputation and method were well known in general and to Chiquita in particular, and were

the subject of any number of newspaper articles and investigations both in Colombia and abroad. *See supra* (Chiquita's knowledge). Chiquita, the Defendants, and Non-Party Executives engaged the AUC to provide security, suppress union activity, and discourage FARC support despite their prior knowledge that the paramilitaries in general – and the AUC in particular – used terrorism and violence against civilians as a strategy to carry out those goals. *See supra* (Chiquita's intentional support).

927.    Despite their general knowledge about the paramilitaries' tactics and specific understanding of the paramilitaries' activities in Urabá, Chiquita, the Defendants, and Non-Party Executives specifically engaged, paid, facilitated, condoned, conspired with, and otherwise supported them to suppress union activity and discourage support of the FARC – the very activities for which their brutal tactics were notorious. Chiquita, the Defendants, and Non-Party Executives played this role with the knowledge and intent that the paramilitaries would commit the abuses alleged herein, and they continued to play this role as it became clear that their support was assisting with the torture, murder, and other abuse of Chiquita, the Defendants, and Non-Party Executives' opponents. *See supra* (knowing and intentional assistance).

   iv)    *Plaintiffs' and decedents' distress was genuine and substantial.*

928.    The AUC's torture and execution of the decedents caused them severe mental and physical trauma prior to their deaths. *See supra* (Plaintiffs' Injuries).

929.    The AUC caused the surviving Plaintiffs severe mental and physical pain in witnessing or learning of the murders of their family members. Individual Plaintiffs also experienced suffering in being threatened against pursuing an investigation of the deaths, being forced to flee the area, and feeling threatened and frightened that the AUC would also target them. These fears,

disturbances, and traumas constitute genuine and substantial distress, of a sort so severe that no person could reasonably be expected to endure it.

### N.  Fourteenth Claim for Relief – Negligence/Negligent Hiring/Negligence Per Se

930.     The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

931.     Chiquita, the Defendants, and Non-Party Executives' conduct constitutes negligence and is actionable under the laws of New Jersey, Florida, the United States, and Colombia.

932.     Chiquita, the Defendants, and Non-Party Executives' conduct constitutes negligence in that 1) they owed Plaintiffs and decedents a duty to act with reasonable care not to injure them, 2) they breached that duty, 3) it was reasonably foreseeable that their negligence would cause injury, damage, loss, or harm to Plaintiffs and their next of kin.

933.     Chiquita, the Defendants, and Non-Party Executives' negligent actions include, but are not limited to, unreasonably disregarding the risk that persons in their employ would commit torts against Plaintiffs and decedents, and violating statutes and other laws designed to protect Plaintiffs and decedents.

934.     As a result of these acts, Plaintiffs and decedents suffered harm including, but not limited to, death, physical injury, and severe emotional distress.

   i)    *Chiquita, the Defendants, and Non-Party Executives breached their duty to Plaintiffs by failing to act so as to stop engaging in the conduct described herein, and by failing to take steps in their power to prevent or prohibit such conduct.*

935.     By continuing to provide financial support, arms, and assistance in smuggling drugs, as well as facilitating, condoning, and/or conspiring with the AUC to carry out the Colombian

government's violent paramilitary campaign against civilians, Chiquita, the Defendants, and

Non-Party Executives breached their duty to Plaintiffs to act with reasonable care so as not to

cause injury to them. *See supra* (Chiquita's support, aiding and abetting, conspiracy, agency)

936.    At all relevant times, it was in Chiquita, the Defendants, and Non-Party Executives'

power to cease their assistance, support, facilitation, condonation, and conspiracy with the AUC

or to prevent or prohibit such conduct, but instead they continued in their course of conduct

continuously from 1995 until at least 2004.

   ii)    *Chiquita, the Defendants, and Non-Party Executives' conduct alleged herein proximately*
          *caused Plaintiffs and decedents to suffer physical and emotional harm, including death.*

937.    By continuing to provide financial support, arms, and assistance in smuggling drugs, as

well as facilitating, condoning, and conspiring with the AUC to carry out the Colombian

government's violent paramilitary campaign against civilians, Chiquita, the Defendants, and

Non-Party Executives proximately caused the injuries alleged in this complaint. Their

involvement in the AUC's activities – including providing arms, money, and other assistance –

began before Plaintiffs' injuries were incurred and continued long after. Chiquita, the

Defendants, and Non-Party Executives' support foreseeably became a crucial component in the

AUC's ability and motivation to attack Plaintiffs, decedents, and countless other civilians in

Urabá. *See supra* (Chiquita's support to the AUC, assistance was substantial).

   iii)   *At all relevant times, Chiquita, the Defendants, and Non-Party Executive*s knew that the
          *AUC was an organization dedicated to the use of terrorism and violence against civilians*
          *and that it would use violence against perceived opponents of Chiquita, and could have*
          *foreseen that this could and would cause physical and mental harm to the AUC's victims.*

938.    From the moment of their first involvement with paramilitary groups, Chiquita, the

Defendants, and Non-Party Executives were aware that their assistance, collusion, facilitation,

and support would result in the killing, torture, and other abuses committed against civilians in Urabá by the AUC.

939. At all relevant times, paramilitary groups like the ACCU and the AUC were notorious for their brutal methods and tactic of declining to discriminate between combatants and civilians. Their reputation and method were well known in general and to Chiquita in particular, and were the subject of any number of newspaper articles and investigations both in Colombia and abroad. *See supra* (Chiquita's knowledge). Chiquita, the Defendants, and Non-Party Executives engaged the AUC to provide security, suppress union activity, and discourage FARC support despite their prior knowledge that the paramilitaries in general – and the AUC in particular – used terrorism and violence against civilians as a strategy to carry out those goals. *See supra* (Chiquita's intentional support).

940. Despite their general knowledge about the paramilitaries' tactics and specific understanding of the paramilitaries' activities in Urabá, Chiquita, the Defendants, and Non-Party Executives specifically engaged, paid, facilitated, condoned, conspired with, and otherwise supported them to suppress union activity and discourage support of the FARC – the very activities for which their brutal tactics were notorious. Chiquita, the Defendants, and Non-Party Executives played this role with the knowledge and intent that the paramilitaries would commit the abuses alleged herein, and they continued to play this role as it became clear that their support was assisting with the torture, murder, and other abuse of Chiquita, the Defendants, and Non-Party Executives' opponents. *See supra* (knowing and intentional assistance).

iv) *The AUC's dedication to the use of terrorism and violence against civilians proximately caused Plaintiffs' and decedents' injuries.*

941. It was the AUC's tactic of using terrorism and violence to intimidate civilians, suppress union activity, and discourage support of the FARC – with the assistance and collaboration of

Chiquita – that proximately caused the deaths of decedents and the mental and physical injuries to Plaintiffs.

> v) *Chiquita, the Defendants, and Non-Party Executives' acts of material support to the AUC, along with its acts of assistance, support, direction, and collusion, violated laws designed to protect Plaintiffs and decedents, the violation of which constitutes negligence* per se.

942.    Chiquita, the Defendants, and Non-Party Executives' support of the AUC violated laws of the United States, Colombia, and New Jersey, Florida, as well as customary international law, which were meant to protect Plaintiffs and others.  These laws include the Alien Tort Statute and the Torture Victim Protection Act (28 U.S.C. § 1350), among other U.S. statutes, and Colombian statutes outlawing paramilitarism and implementing Colombia's international human rights obligations.  The violation of these laws was negligent and willful, therefore constituting negligence *per se*.

## O. Fifteenth Claim for Relief – Loss of Consortium

943.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

944.    Chiquita, the Defendants, and Non-Party Executives' conduct caused surviving Plaintiffs to suffer loss of consortium and is actionable under the laws of New Jersey, Florida, the United States, and Colombia.

945.    At all times prior to their deaths, the decedents noted above were faithful, loving, and dutiful spouses, parents, children, and other family members to the Plaintiffs who are their spouses, children, parents, and other relatives, respectively.

946.    As a result of the acts of the Defendants, those Plaintiffs who are the spouses, children, parents and other family members of the decedents have been deprived of the decedents' society,

comfort, attention, services, and support, all to their damage, in an amount to be proved at trial. In addition, those Plaintiffs have suffered and incurred the expenses of funeral and burial for the decedents, in an amount to be proved at trial.

947.    The Defendants are liable to Plaintiffs because they aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC in causing Plaintiffs to suffer loss of consortium.


WHEREFORE, Plaintiffs pray for judgment as hereinafter set forth.

## X.    **PRAYER FOR RELIEF**

WHEREFORE, each and every Plaintiff prays for judgment against each defendant in excess of $75,000, as follows:

(a) for compensatory damages, including general and special damages;

(b) for punitive damages;

(c) for injunctive and declaratory relief as this Court deems appropriate;

(d) for disgorgement of profits;

**(e)** for costs of suit, attorneys fees and such other relief as the Court deems just and proper.

## XI.    **JURY TRIAL DEMAND**

948.    Plaintiffs hereby demand a jury trial on all issues so triable.

Dated: March 11, 2017                    /s/ Leslie Kroeger
                                         Leslie M. Kroeger (FL Bar No. 989762)
                                         lkroeger@cohenmilstein.com
                                         COHEN MILSTEIN SELLERS & TOLL PLLC
                                         2925 PGA Boulevard, Suite 200
                                         Palm Beach Gardens, FL 33410
                                         Telephone: (561) 515-1400
                                         Facsimile: (561) 515-1401

Marco Simons
Marissa Vahlsing
Richard Herz
Sean Powers
**EarthRights International**
1612 K Street NW #401
Washington, DC 20006
Tel: 202-466-5188

Agnieszka M. Fryszman
Benjamin D. Brown
**Cohen Milstein Sellers & Toll, PLLC**
1100 New York Ave., N.W.,
West Tower, Suite 500
Washington, D.C. 20005-3964
Tel: 202-408-4600
Fax: 202-408-4634

Paul L. Hoffman
**Schonbrun DeSimone Seplow Harris & Hoffman LLP**
723 Ocean Front Walk
Venice, CA 90291
Tel: 310-396-0731
Fax: 310-399-7040

Judith Brown Chomsky
**Law Offices of Judith Brown Chomsky**
Post Office Box 29726
Elkins Park, PA 19027
Tel: 215-782-8367
 Fax: 202-782-8368

Arturo Carrillo
**Colombian Institute of International Law**
5425 Connecticut Ave., N.W., #219
Washington, D.C. 20015
Tel: 202-994-5794

*Counsel for Plaintiffs*

155